## MORGAN C. HAMILTON v. WILLIS AVERY.

The fourth Article of Stephen F. Austin's colonial contract, dated November 20th, 1827, for what was known as his Little Colony, did not authorize the extension, by the Commissioner of said colony, to colonists thereof, of titles to land lying without the limits of said colony, and within the limits of the colonial contract afterwards obtained by Austin and Williams; notwithstanding the consent of Austin and Williams, to the selection so made, may have been obtained.

Where part of a colonial headright lay within the colony and part without, and the boundary of the colony was well defined, it was held that the grant was void as to the part lying beyond the limits of the colony, the Commissioner having no authority to extend titles for land outside of the colony.

Quere, whether this Court can consider an Act of the Legislature, passed during the pendency of the appeal, confirming certain titles to land, among which is that of the appellee.

Where an Act of confirmation contained a proviso, saving " the rights of third persons," it was held that the effect was the same as if it had saved "the right of any person or persons claiming the land adversely" to the person in whose favor the confirmation was made.

See this case for a review of the principles upon which it has been decided that the Government may, for the purpose of detecting frauds, require the holders of imperfect claims for land, to re-establish their validity within a given time; and upon which, also, it has been decided that the confirmation of claims to land which had become null, under the operation of the laws passed to detect fraudulent certificates, and the extension of the time for the making and return of surveys, which had become null by failure to be returned within the time prescribed by law, relate back, and destroy an intermediate survey for another claimant.

Where the Legislature passed an Act, confirming certain colonial titles which lay partly within the colony and partly without the colony, declaring them to be

Hamilton v. Avery.

as valid as if they lay wholly within the colony, with a proviso saving the rights of third persons, it was held that the proviso saved the claim of one who had caused a certificate to be located on part of the land lying without the colony, and surveyed and returned to the General Land Office before the passage of the Act of confirmation.

Appeal from Williamson. Tried below before the Hon. Thomas J. Devine.

The colonial contract of Austin & Williams was dated Leona Vicario, 25th February, 1831. Arciniega, the Commissioner by whom the title to Avery was extended, was not Commissioner of the colony of Austin and Williams. The fourth Article, quoted in the Opinion, is from the contract for Austin's Little Colony. This appeal was filed on the 16th of November, 1853. The other facts are stated in the Opinion.

*W. S. Oldham,* for appellee. (The Reporters found no brief for appellee, on the merits of the appeal, as it was filed.)

I. After the argument of this cause at the last Term of this Court, the Legislature, on the 25th day of February, 1854, passed an Act, entitled " an Act confirming certain headright grants, lying on the boundary line of Robertson's colony and Austin's Little Colony." (Acts 1854, p. 29.)

The question may be made, whether this Court, in the present attitude of the case, will take notice of this Act, and determine the rights of the parties resulting from it. (See Galloway v. Finley, 12 Pet. 264; Satterlee v. Matthewson, 2 Id. 280; Butler v. Palmer, 1 Hill, 330; Key v. Goodwin, 4 Moore & Payne, 341–351; Williams v. Randon, 10 Tex. R. 74.)

II. Whatever defects may have originally existed in Avery's title, I conceive that this Act obviates and cures them, and makes the title valid from its inception. In order to sustain this conclusion, I shall attempt to establish the following propositions, to wit :—

1. That the power of the Legislature over the public domain is plenary, and until the fee is divested by patent, it is not prohibited by any constitutional inhibition from granting lands, because of any previous location and survey, or other imperfect title.

2. That the Act of the 25th February, 1854, which is claimed as confirming the title of Avery, does not violate any constitutional prohibition.

3. That the laws providing for issuing certificates, and locating

and surveying lands, and issuing patents, provide the remedy, but confer no rights beyond the control of the Legislature.

4. That the legislative confirmation of Avery's title relates back to the date of the title, and makes it valid *ab initio*.

5. That Hamilton's location and survey are not protected by the proviso of the Act of confirmation.

III. In order to sustain my first proposition, it will be necessary to inquire into the nature and extent of the legislative power. (See Constitution, Bill of Rights, Sec. 1; Id. Art. 2, Sec. 1, Art. 3, Sec. 4; Field v. The People, 2 Scam. 81; Cochran v. Van Surly, 20 Wend. 365, per Verplanck, Senator; Butler v. Palmer, 1 Hill, 324; Bennett v. Boggs, 1 Bald. 74; Bradde v. Bromfield, 2 Serg. & Watts, 285; Harvey v. Thomas, 10 Watts, 66; Calder v. Bull, 1 Cond. R. U. S. 172; 1 Nott & McCord, 401; 2 Dallas, 304; 1 Kent, Com. 448.)

IV. The Act of the 25th February, 1854, which is claimed as confirming the title of Avery, does not violate any constitutional prohibition.

The inquiry is limited to the question, whether the Act is a retroactive law, or a law impairing the obligation of a contract, in the sense of the Constitution.

What is a retroactive law? It is not every law that operates upon past transactions, that is a retrospective law and prohibited by the Constitution. In the Society, &c., v. Wheeler, 2 Gallison, R. 138, Mr. Justice Story defines a retrospective law in the following terms: "Every statute which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, or attaches a new disability, in respect to transactions already passed, must be deemed retrospective."

Does the Act under consideration take away or impair any vested right acquired by the appellant, under existing laws? A vested right "is a right resting in perfect obligation." (Butler v. Palmer, 1 Hill, 329.) Imperfect rights or rights resting alone in imperfect obligation, and something remains to be done by the party bound to perfect the right, cannot be said to be a vested right. An imperfect or inchoate right, in my view, is the converse of the term vested right. Such rights must have been so regarded by the Supreme Court of the United States in U. S. v. Kingsly, 12 Pet. 476; U. S. v. Mills' Heirs, 12 Pet. 215; U. S. v. Sybald, 10 Pet. 313; U. S. v. Seton, 10 Pet. 311; U. S. v. Wiggins, 14 Pet. 334; U. S. v. Buyack, 15 Pet. 215; O'Hara v. U. S., 15 Pet. 275; U. S. v. King, et al., 7 How. 333;

Menard's Heirs v. Massey, 8 How. 283; and by this Court in Trimble v. Smithers, 1 Tex. R. 804; Jones v. Menard, Id. 771.

In all these cases it is shown that imperfect titles may be disregarded by the political authority with impunity. But not so as to perfect titles, as decided in McMullen v. Hodge, 5 Tex. R. 34. In the last case, the title being perfect, the right became vested; in the former, the right had not vested. The cases above cited show, that where the title was perfected under the former Government, the holder would be protected in his title, regardless of treaty stipulations to that effect.

If an imperfect title confers a vested right in the claimant to the land, then such title is beyond the power of the Government either to confirm or to annul it. If imperfect titles confer vested rights, then those imperfect titles granted or conceded to citizens of Texas, under the colonization system of Mexico, could not have been disregarded by the new Government of the Republic. At least without an express disavowal on the part of the new Government, the Courts would have been compelled, upon the principles of justice and natural law, to have sustained them.

The true distinction lies between those rights which are executed and those which are executory; or as it would have been expressed by the civil law writers, the *jus in re* and the *jus ad rem*. The distinction between the right in the thing and the right to the thing, is thus clearly defined in White's Recop. 341 to 345: " The former is the power that belongs to a man in a certain and determinate thing without reference to any person; the latter, on the contrary, is the power a person has against another, to oblige him to give or make for him anything. The difference between the two rights is clear. When I have a right in a thing, it is the thing that is bound to me; when I have a right to the thing, it is the person."

Under this authority and others, upon the subject, I conclude that a contract executed, gives a right in the thing, and an executory contract, a right to the thing. One cannot be said to have a vested title or right to lands when the fee is in another, and some act is necessary to be done by such other person, either voluntarily or by judicial coercion, to convey the estate. In such case, the right is in action. The title may never become perfect. A subsequent sale to an innocent purchaser for a valuable consideration, without notice, would deprive the equitable owner of all chance to obtain the legal title, leaving to him his action for damages against his vendor. It certainly cannot be said that

such a right is a vested right in the land, although the party may have a vested right of action.

The claim set up by Hamilton is a location and survey under a certificate for 1280 acres of land. It cannot be said that a location and survey constitute a legal title to land; but the title to become perfect must be consummated by patent. They may serve him as the foundation of a possessory action, or an action of trespass to try title, to enable the holder to remove the obstacles which may stand in the way of the procurement of the final title. But for the Act of 1841, the plaintiff could have no foundation for this suit. And hence it is urged that the Act of February, 1854, does not divest him of any vested right.

It cannot be shown that the Act creates any new obligation, or attaches a new disability upon the appellant, and therefore the law cannot be held to be a retroactive law, in the sense in which such laws are forbidden by the Constitution.

The Act of the Legislature validating Avery's title, is not a retroactive law, for another reason. Being a remedial law, operating alone upon the Government, by confirming the acts of her agents, and upon the rights of the parties whose titles are confirmed, it is therefore emphatically a new rule for future cases whenever one of those confirmed titles comes up for discussion in a Court of justice. A remedial law does not come within the prohibition of the Constitution against retrospective laws. (Watson v. Mercer, 8 Pet. 110; Satterlee v. Matthewson, 2 Pet. 380; 13 Serg't and Rawle, 133; 16 Id. 169; DeLaney v. Tilghman, 6 Gill & Johns. 461; Tate v. Stootzfooltz, 16 Searg't & Rawle, 35; McMaster v. The Com., 3 Watts, 294; Walter v. Bacon, 8 Mass. R. 472; Underwood v. Lilly, 10 Serg't & Rawle.)

Chancellor Kent says: "A retrospective statute, changing vested rights, is very generally conceded in this country, as founded on unconstitutional principles, and consequently inoperative and void. * * * * * But this doctrine is not understood to apply to remedial statutes which may be of a retrospective nature, provided they do not impair contracts or disturb absolute vested rights, and only go to confirm rights already existing, and in furtherance of the remedy, by curing defects and adding to the means of enforcing existing obligations. Such statutes have been held valid when clearly just, and conducive to the general welfare, even though they might operate in a degree upon existing rights, as a statute to confirm former marriages, defectively celebrated, or a sale of lands defectively made or ac-

knowledged. The legal rights affected in those cases by the statute, were deemed to have been vested subject to the equity existing against them, and which the statute recognized and enforced." (1 Kent's Com. 455.)

The Act in question confirms rights existing in Avery, acknowledged by the Act itself, (Warren v. Shuman, 5 Tex. R. 455,) by curing defects and enforcing obligations existing against the Government. If the rights of Hamilton are affected by the Act, those rights were acquired subject to the equity of Avery against the State, and the right of the State to recognize those rights, and confirm them, conferring upon him the legal title.

I think it is equally clear that the law does not impair the obligation of a contract.

The certificate under which the appellant claims the land in controversy, is a bounty warrant for 1280 acres of land. If any contract exists between the Government and the holder of the certificate, the certificate is the evidence of that contract. By the terms of the contract, as set forth in the certificate, the holder is simply entitled to 1280 acres of land. No particular land is specified. The holder cannot claim that the Government bound herself to convey to him any particular land. The law under which the certificate issued is not more definite in its terms than the certificate itself.

It then appears that the claimant cannot set up a contract against the Government, binding her to a greater extent than to grant him the quantum of land specified, leaving it to the State to prescribe the mode in which she will discharge the contract.

The Act in question does not touch this contract, and cannot therefore be said to impair its obligation, and is consequently not obnoxious to any constitutional objection.

V. My third proposition is, that the laws providing for issuing certificates and locating and surveying lands, and the issuing of patents, provide the remedy, but confer no rights beyond the control of the Legislature.

It cannot be claimed that either the law which authorizes the granting of bounty land warrants, or the warrants themselves, give to the holders the right to select the quantity of land to which they may be entitled. This right the holder can claim only under the general laws of the land establishing a general land office, and regulating the general land system of Texas, and which define the mode in which certificates shall be granted, locations and surveys be made, and patents issued. By a reference to,

and an examination of those laws, it will be seen that they merely provide a remedy, by which claimants upon the Government for lands may obtain satisfaction of their demands. These laws compose a part of the general legislation of the State, intended for the control and government of the officers of the State, charged with the disposal of the public lands, but confer no rights upon the claimants. They may be altered, amended, or entirely repealed, without at all impairing the rights of the holders of certificates, leaving their claims in full force, but binding in *foro conscientiæ* upon the political authority, to provide some other mode of satisfaction. In truth there have been various changes, alterations and modifications of the land laws of Texas, which have always been made without the power of the Legislature to make them being called in question.

Should the Legislature pass an Act repealing all laws in force, providing the mode for locating lands and obtaining patents, and establish an entirely different system, similar to that of the United States, I apprehend the Act could not be seriously questioned.

The constant practice of the holders of certificates, sanctioned by all the departments of the Government, of lifting their certificates, and abandoning locations, is proof of my position, that the laws providing for locating, surveying and patenting lands, constitute the remedy and form no part of the right of the claimant. If they were a part of the contract which the holder of the certificate could claim as a matter of right, he would be bound by his location, when once made. The obligation must be reciprocal. If he is not bound, the State is not, but may for reasons satisfactory to herself, decline granting to him the lands which he may select, leaving him the privilege of raising his location and selecting lands elsewhere.

The case cannot be assimilated to a contract between A and B, by which the former agrees to convey to the latter a certain quantity of land which he shall select. In that case, the selection once made and notice given, will bind both parties. But in this case, the State agrees to grant to the holder of the certificate 1,280 acres of land generally, and not specifically. The certificate and the law under which it was issued, are silent, as to which of the parties shall make the selection. The State has, however, provided a remedy by her general laws, authorizing the holder of the certificate to make the selection. The benefit of these laws he cannot claim as a right, but as a privilege.

If these laws do not merely constitute the remedy and form no

part of the right, and a location and survey constitute a legal or vested right, protected by constitutional guaranties, I would ask upon what principle the acts to detect fraudulent land certificates were sustained ? at least so far as those laws affected certificates granted and locations and surveys made before their passage? Yet those acts were sustained by this Court, in Hosner v. De Young, 1 Tex. R. 764; League v. De Young, 2 Tex. R. 497; and also by the Supreme Court of the United States, in League v. De Young, 11 How. 185. If the location and survey constitute a contract, or a part of a contract, binding in obligation upon the State, those Acts impaired the obligation of the contract, by imposing an additional burthen upon the claimant, and in case of non-compliance with those additional requirements, the vested rights, if any existed, of the holders of certificates located and surveyed, were divested. It is only upon the same principle that the Act of February, 1852, requiring surveys to be made, and field-notes returned within a specified time, can be sustained.

These laws were right and proper in themselves, and were demanded by the principles of justice and sound policy. The correctness of the decisions upon the Acts to detect fraudulent land certificates cannot be doubted. The only wonder is that the Acts were ever called in question. But they are manifestly wrong, if the location and survey constitute a vested right, or form part of a contract between the Government and the holder of the certificate.

The above views are, as I conceive, fully established by the decisions of this Court, in several cases. In Hosner v. DeYoung, 2 Tex. R. 497, it is said : " The claims to be acted upon and regulated, by the laws to detect fraudulent land certificates, were only imperfect obligations, and could never be enforced by a judicial proceeding, until the political authority had prescribed the mode. The obligation remains imperfect on the part of the Government as long as it retains the fee. * * * * As incident to the fee being in the Government, it has the right to attach such terms, and impose such regulations, as may be deemed most consistent with sound policy ;" and so in League v. DeYoung.

In Kemper v. The Corporation of Victoria, 3 Tex. R. 135, it is said : " If the sovereign or political power should give preference to one incipient claim, over one more meritorious, the only relief or remedy left to the unsuccessful party, would be an application to the Government for compensation."

If I have succeeded in establishing my proposition, that the

location and survey, merely constitute the remedy, then the appellant cannot claim any right acquired by virtue of his location and survey, as beyond the control of the Legislature. I conceive that I have already sufficiently established the proposition in another branch of my argument, that the Legislature may always control the remedy. Upon this point the following additional authorities are cited: Green v. Biddle, 8 Wheat. 1; Bronson v. Kinzie, 1 How. 311; Butler v. Palmer, 1 Hill, 324; Meiggs v. Hunt, 12 Moore, 357, 359; 4 Bing. 213; Rey v. Goodwin, 4 Moore & P. 341, 351. The validity of Avery's title does not depend upon the preceding propositions to the extent that I have argued them. My motive for bestowing upon them the consideration I have, is, that the questions discussed, legitimately arise in the case, and have not been heretofore settled.

VI. My fourth proposition is, that the legislative act of confirmation of Avery's title relates back to the date of the title and makes it valid *ab initio*. (See Warren v. Shuman, 5 Tex. R. 455; Howard and Wife v. Perry, 7 Id. 264; Le Bois v. Bramell, 4 How. 449; Mills v. Stoddard, 8 How. 345.)

A distinction exists between those cases and the one now under consideration. In the former the junior equity had been perfected into a patent, as well as the senior equity. But in this the equity of Hamilton has not been perfected into a patent; so the appellee holds both the senior equity, and a legislative confirmation which is equivalent, and even superior to a patent.

While upon this point, I will remark that I cannot conceive that a senior equity can have any effect whatever, in supporting a legislative grant. Such grants depend upon the power to make them, and not upon any equities attaching to the grantee. If the Legislature can grant lands to A, who has located upon them either prior or subsequent to B, it would seem equally clear that it can be done regardless of any location whatever. The power of the Legislature to make such grants is an incident of sovereignty, and results from the principle for which I have been contending; that is, that B has no right in the land, but has a claim upon the State, to give him a perfect title to the land, because he may have adopted the prescribed remedy. If the Legislature does not destroy his right, or makes to him compensation, he can have no cause of complaint.

A legislative grant is of a higher nature and of more dignity than a patent, and so must have been considered by the Supreme

Hamilton v. Avery.

Court of the United States, in the cases of Choteau v. Eckhart, 2 How. 354, and LeBois v. Bramell, 4 How. 449, and Grignon v. Martin, 2 How. 319, in which cases congressional grants prevailed over prior imperfect titles secured by treaty stipulations and subsequently confirmed by Congress. Had those legislative grants been considered of no higher dignity or of no more force than a mere patent, the subsequent confirmation of the incipient claim by Act of Congress would have related back, and overreached the intervening congressional grant.

The issuance of a patent is the act of a ministerial officer acting under the authority of and by the direction of law; the law declares the holder of the first equity to be entitled to receive the fee. If the ministerial officer acting in behalf of the Government, through mistake of the fact, or in ignorance of the elder equity should issue the patent to the holder of the junior equity, a Court adjudicating upon the rights of the parties, guided by the principles of equity, would decree the land to the holder of the elder equity, because the title of his opponent was issued contrary to the spirit, intention and meaning of the law; because it was issued contrary to law. Such decree would be pronounced in order to give effect to the intention of the law-making power.

The same reason cannot apply to a legislative grant. It is not made contrary to law, but the grant itself is the exercise of sovereign power. It is not made to one not entitled by law to receive it, but the grant itself is the law of the case, and declares the sovereign will.

Hence it is insisted that the rule that a junior patent, upon a prior equity, will overreach an elder patent on a junior equity, does not apply to legislative grants, but that if the Legislature should grant lands by law to one in disregard of the prior incipient claims of another, "the only remedy of the unsuccessful party would be an appeal to the political authority for compensation."

But allowing the rule to prevail in this case, still I conceive that the title of Avery must prevail. (See 3 Black. Com. 429; Bouvier's Law Dic. title EQUITY; Warren v. Shuman, above cited; Story on Agency, Sec. 239, 244, 246; Robertson v. Teal, 9 Tex. R. 344; Smith v. The State, 5 Tex. R. 397; Jones v. Menard, 1 Tex. R. 771; Trimble v. Smithers, 1 Tex. R. 790.) The confirmation of the title shows that the appellee had an ex-

isting dormant equity upon the conscience of the political authority. (Warren v. Shuman, 5 Tex. R. 435.)

I conceive that I have already shown that Hamilton has no legal or vested right to the land. He has no legal title because he holds no patent. He has no equitable title in virtue of any contract between him and the Government for the land in controversy. If he has any equity it is one arising from his adoption of the remedy devised by the Government, and expending means in the pursuit of that remedy. But that equity would not be enforced against a private individual upon the same state of case, because he selected the land, and had it surveyed with a full knowledge of the pre-existing, paramount and dormant equity of Avery, and therefore made his location subject to the power and right of the State to confirm the title of the latter, by ratifying the unauthorized acts of her agents. As I have already said he is not suing upon his own title, but upon that of the State, his certificate and survey having entitled him under the Act of 1841 to assert the title of the State to the land. The question is not which has the better title, the plaintiff or the defendant, but whether the title is in the State or in the appellee. During the pendency of the suit, the State in her sovereign capacity intervenes and declares that the title of the defendant is and was valid from the beginning. Will the Court in behalf of the appellant, assert a right for the State which she disavows?

Having, as I conceive, shown clearly the pre-existing equity of Avery, then the rule as laid down in Howard and Wife v. Perry, 5 Tex. R. 264, applies, viz: "That if at the date of his alleged title, he acquired an equitable title to the land, the legislative act of 1854 would relate back and operate as a confirmation of his title from its inception;" and so in Warren v. Shuman.

The fact that the equity of the appellee was dormant at the date of the appellant's location, will not prevent such relation back, as decided in the case of Lewis v. Mixon, 11 Tex. R.

VII. The last position which I will endeavor to establish is that Hamilton's location and survey are not protected by the proviso of the Act.

The language is rather vague and uncertain; it is "provided that nothing herein contained shall be so construed as to affect the rights of third parties." It is believed that the proviso was intended to secure rights or titles, which had been perfected to any portion of the lands, before the passage of the Act. That

if any right existed at the time superior to that granted, or which would preclude the political authority from confirming the titles, then the Act shall not be so construed as to affect those rights. The Act operates alone upon the titles confirmed, and does not in any wise destroy, impair or affect adverse titles. It passes to the grantees, all the title which the State held to the lands; if there were other titles those titles were not divested. If there were outstanding titles to any part of the land, superior to that granted or confirmed by the Act, then the confirmed titles cannot prevail over such outstanding titles. In other words, the doctrine of relation was not to apply to any title thus confirmed, so as to make it overreach an older patent upon a junior equity, or the ratification of the acts of the agents of the Government should not divest the intervening vested rights of third persons.

The application of the saving to such a right as I have shown that of the appellant to be, would be a judicial anomaly. A precedent cannot be found for it. " The rights of third parties" must have a definite signification, and cannot be construed to mean every vague and imperfect right which may be conceived by the imagination. It cannot mean else than perfect rights; rights which are vested. I cannot conceive for a moment that this Court will hold that a mere location, or location and survey, which the claimant may hold or abandon at his option, shall be made to prevail over a legislative grant so strongly based upon equity as is the title of the appellee in this case. To show the absurdity of such a principle let us suppose that this Court should hold, that Avery's title was originally invalid, and that in consequence of Hamilton's claim, it was not confirmed by the Act of 1854, and is still void; after which Hamilton should abandon his location; then the land would revert to the public domain. Was it intended that such a contingent claim, dependent upon the mere will and pleasure of the party, should prevent the operation of an Act of the Legislature demanded by the clearest principles of equity and justice? Could the appellee, then, claim the land under his confirmed title, which had already been adjudged void and nugatory? Yet in the absence of such claim the title would not be questioned.

If at the time of the passage of the Act of the Legislature in question, Avery's title was invalid, then the fee to the land in controversy was in the State of Texas. If it was in the State the Act clearly passed it to, and vested it in, the appellee; and it is equally clear that the proviso did not prevent the fee from

so vesting.   Then the title of Avery is a valid fee simple title. The State, by conferring upon him the fee, has declared that she will not, and has put it out of her power, to confer it upon another.   Suppose the Legislature should repeal the Act of 1841, authorizing suit to be brought upon the claim of the appellant, in what would his right then consist?  "an appeal to the political authority for compensation" or a re-location of his certificate, upon lands really vacant and unappropriated.

Now has Hamilton a claim so strong against the State as to authorize him to say she shall not thus invest Avery with the fee?   Shall he be entitled to intervene in behalf of the State, and recover, upon a title which she disavows?   A decision in his favor would be an affirmative answer to the above questions, which in my humble opinion would be preposterous.

I need not argue this question further.   It has already been decided by this Court in Howard v. Perry, 7 Tex. R. 264.   The language of the proviso of the resolution under which the appellant claimed in that case was more specific and definite than in the present case.   It is as follows : " Provided, however, that this Act shall not be so construed as to impair or affect the right of any person or persons claiming the land adversely to the said Hibbins or his heirs."   In that case the Court say that " if Hibbins, in 1832, when his alleged title bears date, acquired an equitable title to the land, the legislative action would relate back and operate as a confirmation of his title from its inception, and would supersede the intervening equitable title of the defendant acquired by his location in 1839 and 1840."

The legislative title in that case only purports to operate from its date ; in this it is a confirmation operating from the date of the original title.   In that case it was a simple grant which did not recognize a pre-existing equity in the grantee ; in this it is a confirmation which recognizes the pre-existing equity of the appellee, and gives it a standing in Court.

The proviso in the resolution in Howard v. Perry, caused the grant to possess no greater efficacy than a patent.   And the Court therefore held, upon the principles of equity, that an elder equity should prevail over a grant founded upon no equity whatever.   Or to express myself in different language, but more clearly, the resolution granted the land to Hibbins' heirs, provided there was no person in equity better entitled to it.   The Court held that Perry was better entitled to it in equity, and therefore decided in favor of his claim.

Although I conceive that the construction I have already given to the saving of the Act in question is the true one, because of the difference between that and the resolution in Howard v. Perry, yet no more can be claimed by Hamilton in this case than was adjudged to Perry in that. Under that construction the Act in question grants the land to Avery, provided Hamilton is not in equity better entitled to it. Avery's is the elder equity, and must therefore prevail.

If Avery fails, he has no claim upon the State; if his opponent should not succeed, he loses nothing but his costs. He still has all that the Government ever promised him, with the entire mass of public domain open to him for satisfaction.

*A. J. Hamilton*, for appellant. I. In reply to the argument of the counsel for the appellee, based upon the Act of 25th Feb'y, 1854, the following is submitted.

The first point made in the argument for the appellee is, that the Court will, in the present attitude of the case, take notice of the Act of the Legislature above recited, and give effect to it in deciding the cause. In support of this position, we are referred to authorities, which, upon examination, will be found to be inapplicable to the point raised, or, if in a degree applicable, establishing the converse of the position assumed. The first cited simply decides that a legislative grant made in favor of one of the parties litigant, pending a suit, could be invoked against the plaintiff who had no right or title, but who claimed by a location which the law expressly forbade, and which was consequently null and void. The other cases cited do not touch the question.

The case of Williams v. Randon (10 Tex. R. 74) does not reach the present attitude of this case. There is a marked difference between the rule which would have permitted the appellee to have plead, in the Court below, a title acquired by him, pending the suit, and that which would permit him now to plead here, for the first time, a title not presented in the record, and which, according to his own showing, has been acquired since the cause has been in this Court. It is unnecessary to say that the jurisdiction of this Court is strictly appellate; that it can, and will adjudicate nothing which is not shown by the record to have been adjudicated in the Court below. (3 Tex. R. 10; 5. Id. 1; 3 Dall. R. 326; 5 How. R. 119; 2 Johns. R. 163–171; 3

40

Cr. R. 159; 6 Id. 307; 8 Tex. R. 341; see also 4 Art. State Constitution, Sec. 3.)

II. I pass now to the leading positions assumed by the appellee's counsel, and will note my dissent by counter-propositions, which I believe fully sustained by authority. I say :—

1st. That the power of the Legislature over the public domain ceases when, in pursuance of law, it has been located and surveyed by virtue of a valid certificate; that thenceforth it is private property, which cannot be rightfully divested out of the holder, by any power in the Government, except for public purposes, in pursuance of the constitutional provision for that express purpose.

2d. That the laws providing for issuing certificates and locating and surveying lands, issuing patents, &c., afford remedies for acknowledged rights; and when pursued by a party in acquiring a right to land, form a contract between him and the State, the obligation of which cannot be impaired by subsequent legislation.

3d. That the legislative confirmation of Avery's title, or pretended title, did not relate back to the date of such title, and make it unqualifiedly good and valid *ab initio;* and that the proviso in said Act was intended as a limitation upon the confirmation of title, and to prevent its being operative against any valid claim existing in the hands of any third person.

III. In support of my first position I refer first to the 14th, 16th and 21st Sections of the 1st Article of the State Constitution, and the 10th Section of the 1st Article of the Constitution of the United States.

With these great landmarks in view, compelling the legislative department of the Government to respect sacredly, the obligation of contracts, and the property of the citizen, let us inquire :—

1st. What is a contract? It may be defined to be an agreement between two or more, concerning something to be done whereby the parties are bound mutually to each other, or one is bound to the other. (Sumner v. Williams, 8 Mass. R. 162–178.)

A law made after the existence of a contract, which alters the terms of it by rendering it less beneficial to the creditor, or by defeating any of the terms upon which the parties had agreed, impairs its obligation, within the meaning of the Constitution of the United States. (Blanchard v. Russell, 13 Mass. R. 1–16; King v. Denham Bank, 15 Id. 447.) The "obligation of a contract" is the law which binds a party to perform his undertaking.

(4 Wheaton, 197 ; 12 Id. 318–337; Id. 213 ; 4 Cond. U. S. R. 414.)

A location of a valid certificate, and survey made thereon, in pursuance of the laws, is a contract within the meaning of the term "contracts" as used in the Constitutions of the State and of the United States. It will be admitted that if land so held is "property" within the meaning of the term as used in the 16th Section of the first Article of the State Constitution, it is so by virtue of a contract, under law, between the holder and Government. What then is property? It is that which has been fairly acquired by purchase or other legal means, and which acquisition confers possession; or the right to the possession. When, therefore, land is purchased from the State of Texas by means of one of her outstanding obligations for land, and the proper officer of the Government paid for surveying it from the mass of the public domain, it becomes the property of the locater, and no longer the property of the State. (Carroll v. Saffold, 3 Howard, 441, 460, 461 ; Sim's Lessee v. Irvine, 3 Dallas, 456 ; Levi v. Thompson, 4 Howard, 19 ; Ross v. Borland, 1 Peters, 655 ; United States v. Hughes, 11 Howard, 568.) In the last case it is said "the United States, as owner, having been paid for the land, was bound to make the purchaser a title, in the same manner that an individual would have been bound under similar circumstances." Is this not a contract? Does it not confer property? and in this property has not the party a vested right? In support of the affirmation of these questions are the following authorities : Le Bois v. Brammell, 4 Howard, 459 ; Howard v. Perry, 7 Tex. R. 266; Goodeno v. Phillips, 3 Lou. R. 62 ; 4 Robinson, 79 ; Winter v. Jones, 10 Geo. R. 190; 15 Howard, 538; Stoddard v. Chambers, 2 Howard ; and Wells v. Stoddard, 8 Howard.

But it is said that before the issuance of patent the contract is executory, and therefore does not confer such right as is the subject of constitutional protection. I assert that executory contracts are as much the subjects of constitutional protection as executed contracts. (Fletcher v. Peck, 6 Cranch, 88; 1 Kent's Com. 414 ; New J. v. Wilson, 7 Cranch, 164 ; Green v. Biddle, 8 Wharton, 1 ; Story on Con't'n, Sec. 1380—86.)

The ground assumed in argument on the part of the counsel for the appellee, that so long as the title remains incomplete (that is not patented) the land is under the control of the Government, and subject to its disposition, is most fallacious, unsound and

untrue. I assert that respectable authorities to that effect cannot be produced. In all the cases cited, or that can be cited, where inchoate titles have been overreached by grant or patent, such inchoate titles were such as had no standing in the Courts of the country; were mere floating claims, not attached to any particular lands; or such other merely equitable claim as had lost validity and force. Such were the cases decided in this Court. (Land Commissioners v. Reily, Dallam, 381; Same v. Walling, Id. 524; Hosner v. De Young, 1 Tex. R. 764; Jones v. Menard, Id. 771; Trimble v. Smithers, Id. 790; Norton v. Com'r G. L. O. 2 Id. 357; League v. De Young, 3 Id. 497; Kemper v. Victoria, Id.; Jones v. Borden, 5 Id. 410; Warren v. Shuman, Id. 441.) And such were the cases decided in the Courts of the United States. (Henderson v. Poindexter, 12 Wheaton, 543; Choteau v. Eckhard, 2 Howard, 379; Hickey v. Stewart, 3 Id. 750, and on particularly page 762; United States v. King, 3 Howard, 773, and this case explains former case on page 787; Le Bois v. Brammell, 4 Id. 449.) The last case settles the question as to the retroactive effect of a confirmatory Act on a former invalid claim, so as to defeat an intermediate vested right; and the case of Choteau v. Eckhard, 2 Howard, 379, above cited, establishes the same principle.

But it is said by the counsel for the appellee, that the appellant has no such right to the land in controversy, as will be protected by the Constitution, because he says a vested right is a right resting in perfect obligation. So far I concur with him. And the case cited by him in 1 Hill, 329, is far, very far from supporting his conclusions.

He further asserts that "imperfect rights, or rights resting alone in imperfect obligation, and something remains to be done by the party bound to perfect the right, cannot be said to be a vested right." The proposition, as put, involves a legal paradox. It proceeds evidently upon the presumption that no vested right to land can be evidenced by anything short of a perfect title in form; that the "vested right" in respect of land protected by the Constitution, is connected with, and inseparable from, the deed or patent, which is *prima facie* the highest evidence of legal title. In this hypothesis, as also in the argument based upon it, the shadow has been pursued, while the substance has been disregarded. The actual legal right is the thing in question, and not the *prima facie* evidence of right.

We have seen by the authorities cited, that the right, equit-

able and legal, to land acquired in pursuance of law, is as good and valid before the issuance of a patent as afterwards. The authorities cited by the appellee's counsel to this point on the 7th page of his brief refer to mere equities against the political department of the Government.

Title to lands is the means whereby the owner has the just possession of his property. (2 Blacks. Com. 195.) What these means are depends upon the laws of the land, and whatever is recognized as giving a "just possession" will constitute title.

Both our statutes and the decisions of our Courts recognize a location and survey as giving this just possession of lands. They form the basis of an adverse possession, to the same extent that a patent or grant does.

The different steps of a title to lands are prescribed by our laws. Thus the first Board of Land Commissioners was to investigate all claims on the Government for headrights to land, and to grant a certificate for the claim, for which payment was made. (Hart. Dig. Art. 1847 and 1851.) This was declared sufficient evidence to authorize any Surveyor to survey any lands which the holder of the certificate might point out agreeably to the laws on the subject. (Hart. Dig. Art. 1853.) The Surveyor was to record the field-notes; certify copy to the Land Office; return the original to the Board of Commissioners; for which compensation was made. The fees and the price of the land was to be paid, and the field-notes transmitted to the Commissioner of the General Land Office; who was required "forthwith" to make out a patent for the land. (Hart. Dig. Art. 1872 and 1949.) This serves, without following the changes in the law, to show the character to titles under our laws.

The issuance of a patent is a mere ministerial act. No exercise of discretion or of political authority is involved in it. It issues of right, and as a matter of course; and can be enforced by mandamus. (3 Tex. R. 51; Id. 88; 5 Id. 480; Gregnon v. Astor, 2 Howard, R. 344; Stoddard v. Chambers, Id. 318.) The patent is not the right, but the mere evidence of right previously existing. (Miller v. Alexander, 8 Tex. R. 42.)

Our statutes expressly authorize the action of ejectment on a location as the basis of adverse possession. They taxed a location and survey, and in every sense regarded the location and survey as property.

It is true, the patent is called the legal title; and here the confusion arises; and it grows out of the difficulty between the

jurisdictions of Law and Equity Courts. Where the evidence of right or title was perfect, as by a deed or patent, the Courts of law had cognizance thereof, and their forms of judgment were adapted to the remedy, and hence they are called legal titles or rights. But where this evidence was not perfect, the remedy was sought in the Courts of Equity, and hence they were called equitable titles or rights. But under no Government or system of law was an equitable title less a title, or of less validity than a legal title. They differ merely in their evidence and the remedies for their enforcement. In all cases Courts of Equity will look behind the patent, and the party having the best right or equity, will be recognized as having in fact the title. (Miller v. Kerr, 7 Wheaton, 1.)

ROBERTS, J. The land located and surveyed by Hamilton, by virtue of a land warrant for 1120 acres, is situated entirely out of the limits of Austin's Little Colony, (as it is called.) The survey was made in April, 1847, and the field-notes were examined and returned into the General Land Office before suit was brought by Hamilton, which was on the 7th September, 1849. Avery claims title to the land sued for, under a grant issued to him "as a colonist in the enterprise of colonization contracted with the Government of the State of Coahuila and Texas by the empressario Estevan F. Austin, on the 20th of November, 1827," by Arceniaga, Commissioner to issue titles to the new colonists. The title bears date the 13th of November, 1832. The league thus granted lies partly within and partly without said enterprise, (which is known as Austin's Little Colony,) nearly all of it being without the limits, and covers the land claimed and sued for by Hamilton.

It is sought to obviate the difficulty here presented, of the land in controversy being out of said colony, by showing that after this contract of 1827, and at the time of this grant in 1832, Austin and Williams had a colonization contract for the land which was included in the grant, and which is now in dispute, and that they gave their consent to this selection of land by Avery, and which, it is contended, was authorized by Austin's contract of 1827. It is only necessary to recite the clause under which this is claimed, to show that it is not tenable, both from the terms of the contract and the proof that the land was not anything like exhausted in the Little Colony when this grant was made. The fourth Article

reads as follows : " Should the territory herein described not be sufficient for the location of the above mentioned one hundred families, the greatest number possible shall be settled therein, and the remainder may be settled on any of the vacant land already contracted for by the said empressario." It was also in evidence that Avery was present when his survey was made in 1832, and knew that the portion of the land which is now in controversy was without the limits of the colony. Hamilton's survey is north of Brushy, which is a tributary of the Brazos; and the line of Austin's Little Colony is the dividing ridge between the waters of the Colorado and Brazos.

The first question arises upon the validity of that portion of Avery's grant that is without the limits of the colony, which is covered by Hamilton's survey. This is decided in the case of Mason v. Russell's Heirs, (1 Tex. R. 730,) and confirmed in the ultimate adjudication of the same. (8 Tex. R. 226.) In that case the Court say, in speaking of the Commissioner's authority : " His authority was not general, so that it would embrace land anywhere in Texas; it was limited to a particular tract of territory, designated by the law of the contract; beyond such limits his acts would be void, because, acting on a subject-matter over which the law had given him no control." And it was held that, as the grant was a nullity, parol evidence was admissible to prove that which made it so. (1 Tex. R. 730.) The same principle, applied to this case, would determine Avery's grant, as to the land in controversy, absolutely null and void. The principles of the case of Hamilton v. Menifee, (11 Tex. R. 748,) of an unascertained boundary, do not apply to the facts of this case. So stood the case at the time of the trial below.

In 1854, after this suit was determined below, the Legislature of the State passed an Act confirming Avery's title to his said league, with the following reservation : "Provided, that nothing herein contained shall be so construed as to affect the rights of third parties." Admitting that, under the authority of Jennings v. De Cordova, (decided at this Term,) the Court can consider this Act, in deciding this case, does not this proviso save Hamilton's right to the land from being affected by the Act, and place it on the same footing as though the Act had never been passed? This question, too, has been directly decided by this Court in the case of Howard v. Perry. (8 Tex. R. 262.) In that case there was merely a survey, without any authority, under which Hibbins held as a colonist, and there was a legislative grant of the land,

with a proviso, " that this Act shall not be so construed as to impair or affect the right of any person or persons claiming the land adversely to said Hibbins or his heirs." It was held that this " saving, contained in this proviso, embraces and reserves the right of the defendant ;" and as the defendant had located and surveyed the land by virtue of a genuine certificate, and as the land had not been appropriated legally by Hibbins, and was therefore entirely vacant when surveyed by the defendant, he was entitled to recover, notwithstanding the subsequent Act of confirmation in favor of Hibbins or his heirs. · Although the words used in these two provisos are different, their meaning must be the same. One saves the " rights of third persons," and the other saves the "right of any person or persons claiming adversely," &c. The Legislature would hardly think it necessary to save the rights of persons who did not claim adversely to Avery ; and it would be merely futile to save the rights of persons who had no claim at all.

The Legislature, in acting on a specific claim of this sort, it is to be presumed, examined into the facts of the case, and were fully advised that there was a conflicting claim set up to this land by third persons, and inserted this proviso for the express purpose of preventing the Courts from giving this confirmatory Act such a construction, as should in any manner affect the rights of third persons, whatever they might be. This view is sustained by the case of Hart v. Gibbons. (14 Tex. R. 215.) There, the time had run out, in which Gibbons should have returned his field-notes ; Hart located and surveyed the land ; and afterwards a law was passed extending the time for the return of field-notes. It was held that "no incipient or incomplete title acquired (by Hart) during that interval, could present any legal bar to a restoration of the rights of the first locater" (Gibbons.) Justice Lipscomb, in delivering that opinion, says, that if there had been a saving clause in the Act extending the time for the return of the field-notes, such as was in the Act for the relief of Hibbins' heirs, (in case of Howard v. Perry,) " there can be no doubt that the appellant's (Hart's) right would have been in like manner sustained."

It is contended that " the rights of third parties," which are not to be affected by this Act, in the case now before the Court, are vested rights, evidenced by a patent or an absolute title in fee from the Government, and not such an imperfect or incipient right as is conferred on Hamilton by his survey upon a land war-

rant, returned into the General Land Office.  To support this proposition decisions of our own Court are relied on, as well as other authorities.

To a proper understanding of what has really been decided by our Supreme Court, it is necessary to have accurate ideas of what is called an equity, in contradistinction to the legal title, in lands. When a party has only a survey by virtue of a certificate, it is said to be an equitable title; and that term is used as matter of convenience, and in contradistinction to the patent's being the legal title.  Equity has been defined to be "a right, existing in *foro conscientiæ*, but which cannot be enforced by the strict rules of law."  This may be correct as a definition of a dormant equity.  But a subsisting equity, by the laws of this State, that recognize no distinction between law and equity, either in rights or their judicial preservation, confers a right of property by as strong a sanction, as that which exists by a right purely legal. Or in other words, a rule known to equity jurisprudence is as much a binding rule of action, as to all of our rights of property, in all our Courts, as though it were a rule of the Common Law, recognizable only in a Common Law Court.

By complying with certain rules of law, A makes a contract for land with B, pays the purchase money, gets a deed and has it recorded, and thereby gets a perfect right to the land.

By complying with certain other rules, A makes a contract for land verbally, pays the purchase money, takes possession and makes valuable improvements thereon, and thereby acquires a right to the land from B his vendor, as fully sanctioned by our rules of action as prescribed by the Legislature of the State, and as fully recognized by all of our Courts, as though he had a deed to the land.

The considerations for which the Republic and State of Texas have granted land to our citizens, have been money, or services, or emigration to the country; and in order to grant her lands, by divesting herself and vesting in the citizen a perfect right, in the shape of a patent, to a particular tract, which was the ultimate object sought to be attained, it became necessary to prescribe certain rules, which established certain tribunals and officers, for the performance of certain duties, and which enjoined upon the citizen, seeking the land, the performance of (in addition to the consideration given for the land) certain duties to be by him performed, to accomplish this object.  These duties of the citizen were, to get his certificate in a certain time, designate

the land, in a certain time have it surveyed, examined and recorded by the surveyor, and returned to the General Land Office. Now the doctrines which the decisions of this Court have established are: First, that if the citizen, in any one of the steps, that have to be taken to acquire this perfect grant, and in the performance of a duty enjoined by these rules, thus established for that purpose, commits a fraud and thereby obtains a certificate, survey, &c., it is void; and the Government may, for its own protection against such fraud and imposition, prescribe additional rules, if necessary, imposing upon the citizen the duty, and giving him the opportunity, in a certain time, to show that the incipient right which he has obtained, as a certificate, survey, &c., is not tainted with fraud. (Hosner v. De Young, 1 Tex. R. 769; League v. De Young, 2 Id. 497.) The Supreme Court of the United States, in affirming the case last cited, say, that "judgments as well as grants, obtained by fraud or collusion, are void and confer no vested title; and a State may justly require those who claim that their grants are not of this character, to make proof of their genuineness in some proper tribunal, before they can be entitled to a survey or patent under them, and may limit the time within which suits may be instituted." (League v. De Young, 11 How. R. U. S. 203.)

Secondly, this Court has held, that the State, by a legislative act, may waive its right to exact of the citizen a strict and full performance of any one or more of his duties, which have been imposed on him by these rules. For instance, if he have a survey and fail to return it to the General Land Office in the time, within which these rules make it his duty to return it, the State may waive this neglect of duty on his part, and allow further time to do it; and if he should comply with this requisition, his original, incipient right to the land is preserved in its full vigor, if between the time he should have returned the field-notes and the time of the Act of relief, the Government has not granted the land by perfect title to another. (Hart v. Gibbons, 14 Tex. R. 216.) The same principle is maintained in the case of Warren v. Shuman, 5 Tex. R. 456; Lewis v. Mixon, 11 Tex. R. 570; and Jennings v. De Cordova, decided at this Term. In all the cases of this character, the right of the party had legally attached to the land, by the performance of duty in some of the steps; by a legal survey, pre-emption settlement, &c.; and this is what is called an equity. As soon as the party was in default, by not

performing a further duty enjoined upon him, the obligation of the Government to make a grant to that land ceased to be imperative. None of its officers could be forced, by judicial process, to recognize it as a subsisting right. It was discretionary with the Government whether it would grant the land to another or not, and whether or not it would waive the non-performance of the neglected duty, and give further time to do it. But if it chose to waive it, and in the mean time a third party had surveyed the land, without getting a perfect title, during the dormancy of the original right, here were presented two claimants to the land, equal in right so far as the performance of duty in the steps of acquisition are concerned; and it is reasonable, in deciding between them, that the older right, other things being equal, shall be preferred.

In both classes of these cases there is nothing decided, which tends to establish that Hamilton did not have a right of property in the land, which the Government recognizes and protects, as against itself, and as against individuals who have no superior right.

Our Courts have recognized a survey, by virtue of a valid certificate, as a valid right; a right of property, as fully as any other rights. It is a right binding on the Government; upon which the Government, through the Commissioner of the General Land Office, can be compelled, by judicial process, to issue a patent. (Com. L. O. v. Smith, 5 Tex. R. 480.) It is recognized by the Government as his property, and not public domain, by being taxed and sold for taxes, the same as titled lands. (Hart. Dig. Art. 3137; Carroll v. Safford, 3 Howard, 459.) It confers the right to maintain a suit upon it, to try the title and eject trespassers. (Hart. Dig. Art. 3230; Ross v. Barland, 1 Peters, U. S. R.; Sims v. Irvine, 3 Dall. R. U. S. 456.) It gives a right which is the subject of possession; of purchase; and of inheritance. It is sold under execution, and administered in Courts of Probate. It is regarded in the community as possessing but little less marketable value than patented land.

Can it be reasonably supposed, then, that the Legislature did not intend, by the proviso in question, to save a right so valuable, and so fully clothed with all the leading attributes of property? This right is in nothing less meritorious than a right secured by patent. The citizen has done and performed every duty, incumbent on him about it, and has paid the consideration;

and all that remains to be done is to be done by the Government through the Commissioner of the General Land Office. The Legislature could have no motive to defeat or destroy a right of this sort, any more than a patent.

If it be admitted that the Legislature had a right to affect or impair this right, and have not to impair a patent, why should they protect, by the proviso, what they have no power to impair, to wit: the patent; and leave unprotected a right equally meritorious, which their action (according to the present supposition) could impair. Such a construction renders the proviso a mere idle superfluity, without effect of any sort, and presupposes an intention to make an invidious distinction against the right, which is only less perfect in form than a patent, and less perfect, not by the fault of the claimant, but by the delay of the Government in issuing a patent. And above all other considerations, it must be presumed that the Legislature acted under a just appreciation of the fact that this is a Government of law; that its essence is, and existence depends upon a due respect for individual rights legally acquired.

The construction, which alone comports with the intelligence, justice and impartiality of our Legislature is, that the proviso was inserted to prevent misconstruction of, and speculation as to, the meaning of the Act, and to give express notice, that it was not their design to affect, impair or destroy, even if they had the power so to do, any right of a third party, which had attached to the land previous to the Act, whether such right was perfect or imperfect. They were simply willing to grant Avery the land, but not to give him a preference over any one else who had rights in it.

It is assumed that Hamilton's right to lift the certificate is an argument against the right being obligatory on the Government. It must however be remembered, that this was a privilege of the citizen, (previous to our late statute on the subject,) which is granted as a gratuity and favor by the State to receive or not receive a grant to particular land. It does not follow as a logical conclusion, that the grant of this privilege to the citizen confers a like privilege on the Government to grant or not to grant the land at its option. These points being settled, it becomes unnecessary to discuss the constitutional questions presented in the arguments on both sides with signal ability.

The conclusion then is, that this Act of the Legislature of

1854 was intended to leave unaffected the rights of these parties, as they existed before its passage ; that Avery's title was, *ab initio*, and is a nullity; and that Hamilton's right is such a one as enables him to sustain his action.

The verdict and judgment below being contrary to the law and the evidence is erroneous, and must be reversed and the cause will be remanded.

Reversed and remanded.