Lipsoomb, J.
As the first in order, we will examine into the propriety of admitting the paper title offered and given in evidence by the plaintiff. It must be borne in mind that the plaintiff in his petition alleges as the foundation of his action a grant from the state of Ooahuila and Texas under the colonization law; perhaps it was not necessary for him to have rested his right of action on this specific character of title, but having done so, the well established rules of pleading required him to produce proof corresponding with his averment; a departure from this salutary rule would introduce the most serious injury; it would not only operate prejudicially on the defendant by keeping him in ignorance of the cause of action he would be required to defend against, but it would likewise destroy that certainty that should characterize all judicial proceedings, because it is to the cause of action averred by the plaintiff we look for the ascertainment of what has been adjudicated. Nor can the enforce- *(547) merit of this rale affect seriously the rights of the plaintiff, because he can amend and suit his allegations to the proof if he should find that he was mistaken in the original structure of his petition.
That the paper given in evidence was not a grant, as designated in this petition, is too clear to admit of any controversy. It was made out in form but had never been executed by the commissioner authorized by law to extend titles to colonists; the paper in the form it was permitted to go to the jury was not only void but it was calculated to mislead, as having the form without the most essential ingredient of a grant, the commissioner’s name. The papers accompanying this form of a grant, the order of survey and this survey was, if offered as evidence of title, obnoxious to the same objection, as they had not been averred as the ground of the right sued for, but only as con-tiected with or an attendant on the grant. What the rights of the plaintiff are under such order and survey, if he had sued on them, will be considered in a subsequent part of our opinion.
We will now proceed to inquire into the rights of the defendant, J ones, under the statute of limitations, presented by the two exceptions taken by his counsel on the trial, and which are embraced in our statement of this case.
The substance of both taken together amount to this, that if there was no conflict of possession, the actual possession of Jones, the defendant, on a part of his grant, was a possession coextensive with his grant; the court refused so to charge the law, but instructed the jury that if Jones’ possession was not on that part of his grant conflicting with Menard’s claim, the statute of limitations could not avail him; that, although there was no actual possession adverse to Jones, yet if Jones was not in the actual possession of that part of his grant in controversy, the statute of limitations could avail him nothing as a defense. The question of law here presented has been often adjudicated, and we will proceed to the examination of some of the cases decided. In the case of Clark et al. v. Courtney et al. 5 Pet. 319, the charge of the court a quo was: “That an entry under one of the junior grants, given in evidence by the defendants and within the boundaries of the elder, without any specific metes and bounds, other than the abuttals of the grant itself did constitute an adverse possession to the whole extent of the abuttals and boundaries under which such entry was made.” Judge Story in reviewing this charge, 354, id., lays down the doctrine with so much perspicuity that we will cite in his own language a part of the opinion of the court. He says, “ in considering the points growing out of the exception, it may be proper to advert to the doctrine which has already been estab- *(548) lisbed, in respect to the nature and extent of tbe rights growing out of adverse possession — whether an entry upon land to which the party has no title and claims no title be a mere naked trespass or be an ouster or disseizin of the true owner, previously in possession of the land, is a matter of fact depending upon the nature of the acts done, and the interest of the party so entering.
“The law will not presume an ouster without some proof, and though a mere trespasser cannot qualify his own wrong, and the owner may, for the sake of the remedy, elect to consider himself disseized, yet the latter is not bound to consider a mere act of trespass to be a dis-seizin. If a mere trespasser, without any claim or pretense of title, enters into land and holds the same adversely to the title of the true owner, it is an ouster or disseizin of the latter. But in such cases the possession of the trespasser is bounded by his actual occupancy, and consequently the true owner is not disseized except as to the portion so occupied.
“But where a person enters into land under a deed or title, his possession is construed to be coextensive with his deed or title; and although the deed or title .may turn out to be defective or void, yet the true owner will be deemed disseized to the extent of the boundaries of such deed or title. This, however, is subject to some qualification. For if the true owner be at the same time in possession of a part of the land, claiming title to the whole, then his seizin extends by construction of law to all the land which is not in the actual possession and occupancy, by inclosure or otherwise, of the party so claiming under a defective deed or title.”
The charge of the court was fully sustained, and 2 Marsh. (Ky.) 18; 1 id. 376, are referred to. In the case of Ellicott v. Pearl, 10 Pet. 414, Judge Story in giving the unanimous opinion of the court says, page 442: “ An entry into possession of a tract of land under a deed containing specific metes and bounds gives a constructive possession, of the whole tract, if not in any adverse possession, although there may be no fence or inclosure around the ambit of the tract, and an actual residence. To constitute actual possession, it is not necessary that there should be any fence or inclosure of the land. If authority were necessary for so plain a proposition, it will be found in the case of Moss v. Scott, 2 Dana (Ky.), 275.”
The same doctrine has been sustained in New York and South Carolina, 1 N. & McC. 371; and that it is the well-settled rule of construing a possession in the state of Kentucky is obvious from the authorities referred to by Judge Story, as before cited. We believe these principles to be too well established to be questioned at this day. *(549) To apply them to the question at bar, it is manifest the judge erred in qualifying, as he did, the charge asked by the defendant’s counsel.
It was in proof that Jones was in possession under a grant regularly issued; that Menard had never been in possession of any part of the land claimed by him. Had he been in possession by better title, it would have extended to the whole of his claim of title, and would consequently have excluded Jones’ possession from interfering with him beyond actual possession. But he not having been in possession, it was not material whether Jones was in possession of the particular part of his grant conflicting with Menard or not; his possession, under such circumstances, was coextensive with the grant under which he claimed; and it could only have been material in the case of a conflict of possession as well as title.
By the 21st section of an act to regulate proceedings in civil suits, 4th Congress of Texas, p. 91, it is enacted, “ that possession of part shall not be construed as possession of the whole, when any actual adverse possession can be proved” There was no actual adverse possession proven in this case, nor was there any pretense that Menard had ever been in the actual possession. The above statute is nothing more than a declaration of what would certainly have been ruled to be the law of possession in case of a conflict of possession, had the statute have been entirely silent on the subject.
"We have no doubt the principles we have been discussing, and which we have shown to be so firmly established by judicial decisions, after the most thorough investigation by the most eminent jurists that ever gave dignity to the bench, in any age or country, will have a most salutary influence in giving repose to thousands of our citizens who have paid their money and bestowed their labor on lands that they had every reason to believe they held by a good and valid title, and which, but for the statute of limitations, would have been swept from them, and their families turned out upon the world, homeless and houseless.
We will now proceed to examine the correctness of the opinion of the court below in refusing to give the last charge prayed by the defendant’s counsel.
In a former part of our opinion we have slightly adverted to this point in discussing the admissibility of Menard’s warrant of survey, and survey, under the allegations of his petition. The character of the rights of Menard under that warrant of survey, and survey, will be considered.
It is presumed that the court below believed that under the 23d section of the statute of limitations, Laws 5th Congress, 170, Men-ard could sustain his action on this description of claim. The section *(550) is in the following words, viz.: “That all certificates for headright, land scrip, bounty warrant, or any other evidence of right to land, recognized by the laws of this government, which have been located or surveyed, shall be deemed and held as sufficient title to authorize the maintenance of actions of ejectment, trespass, or any other legal remedy given by law, all laws to the contrary notwithstanding.”
To arrive at the true interpretation of this section, and ascertain whether the order of survey and the survey come under the description of “ evidence of right to land that has l>een recognized hy the laws'’ it must be taken in connection with the laws establishing' our land system; for it cannot be doubted that both on principle and authority, at the period of the organization of our government after the revolution, this right could not, in proprio vigore, have had any standing in a court of law. The right was inceptive and inchoate; the title remained in the sovereignty, and required some action of the political authority to consummate it. Imperfect or inceptive claims to land at the date of the transfer of Louisiana to the United States were not considered sufficient to give the claimant any title that could be enforced in a trial at law until such claim had been acted on in some way by the political authority of the sovereignty of the United States. Hence, the various acts of the congress of the United States establishing boards of land commissioners, and giving a special jurisdiction to their courts, for the examination, confirmation or rejection of all such claims from 1805 down to 1836. In all of these the right of the government of the United States to dispose of them in the way that should seem best calculated to distribute justice without the interference or control of any other power on earth is clearly manifested. These claims could assert stronger pretensions of a right to a standing in court than can similar claims in our courts on their own intrinsic merits. The country had been purchased by a treaty, which contained an express stipulation for the protection of the rights of property of the inhabitants of the purchased province, and it could with much plausibility and appearance of right be contended that rights, however imperfect, as they were secured by contract, could be asserted in a court of judicature without any further action of the political authority.
In the case of Souland v. The United States, 4 Pet. 511, Chief Justice Marshall says: “In the treaty by which Louisiana was acquired, the United States stipulated that the inhabitants of the ceded territory should be protected in the free enjoyment of their property. The United States as a just nation regards this stipulation as the avowal of a great principle, which would have been held equally sacred *(551) though it had not been inserted in the contract.” lie further adds, that “ the term property as applied to lands comprehends every species of title, inchoate or complete. It is supposed to embrace those rights which lie in contract; those which are executory, as well as those which are executed.” With such liberal views of the moral obligation of the government under the treaty, and by the laws of nations, and with jurisdiction conferred by the political authority, apparently so ample as to be intended to embrace every conceivable description of claim, the supreme court in every instance of an imperfect right has looked to the authority expressly given to it by the different acts of congress on the subject. And such had been the solicitude of the government to do the most ample justice, that persons holding such claims had been authorized to sue the government and have their claims adjudicated on the most liberal principles; yet cases could and did occur not embraced by the action of the government. The case of Smith v. United States, 10 Pet. 327, was brought, according to the statement of the case, by John Smith, T., under the provisions of the act of 1824, for the adjustment of land claims in the state of Missouri, claiming a confirmation of his title to ten thousand arpents of land in that state in virtue of a Spanish concession to James StYrain, a resident of Louisiana, legally made before the 10th of March, 1804, by the proper authorities. He alleged his claim was protected by the treaty between.Prance and the United States for the cession of Louisiana, and might have been perfected into a complete title under the laws, usages and customs of the government under which the same originated, had not the sovereignty of the country been transferred to the United States. His claim was founded on a petition of StArrain to the governor general of Louisiana in November, 1795, praying for a grant in full property to him and his heirs of ten thousand superficial arpents of lands, with pecial permission to locate in separate pieces; which request, as prayed for, was granted by the governor general on the 10th February, 1796.
It was what is familiarly known as a floating grant, and had never been surveyed or located prior to the treaty.
It was held by the court that, not having been located, nothing had been severed from the public, domain; that it was not a case that came within the powers of the court to adjudicate by the acts of congress of 1824 or of 1828.
In the case of Les Bois v. Bramell, 4 How. (U. S.) 449, it was held that “ the power of granting the public domain was in Morales, who resided in Hew Orleans. Ilis regulations were in force in upper Louisiana, and by them the title to land held under a cession and survey *(552) was not perfected until ratified by Mm and final grant issued. This power was in a great degree a political power, and by the treaty the United States assumed the same exclusive right to deal with the title in their political and sovereign capacity. The courts of justice cannot, without legislation, execute the power, because the holder of an incomplete title has no standing in court.”
Judge Catron, in page 462, says: “ So in this case the plaintiff admits her grant of itself is not sufficient to authorize a recovery, and that she must go behind it; and there she is met by the objection that her claims had no standing in a court of equity or of law up to the date of its confirmation, and depended upon the political power. The plaintiff’s assumption comes only to this, that the United States erred in granting the common first, in prejudice to her better right to have the first grant. To this assumption the answer is that if the sovereign power wronged her, she is without remedy in a municipal court.”
The case to which we have just referred was, in substance, this: The plaintiff claimed by a Spanish concession in 1802 and a survey. Her claim had been rejected by the several boards organized under the provisions of the several acts of congress, and the land in question had been granted by the government to the city of St. Louis; afterwards, under a new board organized by an act of congress, her claim was confirmed, and she claimed that by relation her grant went back to the original concession and survey. Judge Oatron further adds, in the conclusion of the opinion of the court: “When the country was acquired, the title to the land in dispute passed from France to the United States; on this government was imposed the duty by treaty to satisfy individual and imperfected claims. This was to be done in a due exercise of the political power to whose justice alone the claimant could appeal, and to whose decision she was compelled to submit; and there being two adverse claims to the land, equally inchoate, and the government being unable to confirm both, was under the necessity of determining between them; and having granted the land to one, necessarily rejected the pretension of the other to the same land; and, therefore, the first grantee took the legal and exclusive title. But when there has been a second confirmation, as in the instance before us, the justice of the government must be relied on by the second grantee for compensation.”
We have drawn copiously on the decisions of the supreme court of the United States, because a class of cases in that court bear a more striking analogy to those of imperfect title at the organization of our government after the revolution than can be found anywhere *(553) else. There is, however, this difference in those cases and the one at bar; the former were protected by express contract and the latter only by the implied obligation on the part of our government to respect private rights of property; but in both cases the title is imperfect,, and the perfect title resting in the respective governments. If the former could find no standing in a court of law or equity, the claim to such standing by the latter would be certainly still much weaker. An obligation resting on the political power to perform is from its nature imperfect, because, as the sovereignty cannot be compelled to answer in its own municipal courts, until by its own affirmative act it consents so to do; so the rights of parties arising from such obligations remain incapable of being asserted in the courts of the country until the political or sovereign power has indicated the mode in which such rights may be prosecuted. It is therefore clear, both from principle and authority, that in the case at bar the right offered and set up by Menard cannot have any active standing in court, unless it has been imparted to it by the action of political authority. Whether it has received such specific recognition as defined by the 23d. section of the act of limitations, cited at the beginning of this branch of our opinion, is to be ascertained, as before observed, by reference to the several acts of the political authority on the subject of such claims. In the 10th section of the general provisions of the constitution of the republic, it is declared “ that all orders of survey legally obtained by any citizen of the republic, from any legally authorized commissioners, prior to the act closing the land offices, shall be valid.”
The language of the constitution recognizes the obligation of the government to respect and make available such orders of survey, but the obligation is imperfect until further action of the political power, providing the mode in which such rights shall or may be asserted. The constitution being only an organic law left it to the legislature to direct the mode of verifying and proving the class of claims included in the 10th section of the general provisions of the constitution; and until some further action of the political authority, they stood precisely in the same condition of the imperfect titles under the treaty by which Louisiana was acquired.
The 12th section of the general land law, vol. 2, p. 66, provides, “ all orders of survey of headlights, procured under the colonization laws, previous to the declaration of independence, shall be submitted to the examination of the land commissioners, and the holders of the same, whether they be original claimants, their heirs or assigns, shall be subjected to the same formalities and requisitions in procuring *(554) said headright as pointed out for other individuals in' this law.” This section refers in its terms to the class of cases designated by the 10th section of the general provisions only. The 19th section of the same general land law provides that the field notes of every survey which shall be returned to any land office hereafter, for the purpose of getting a title for the same, shall be under oath of the surveyor, who shall swear it was executed according to law, and shall also swear the same was made prior to the closing of the land office by the consultation, or subsequent to the opening of the same by this act; and if made prior to the closing of the land office by the consultation, the same shall also be proved by at least two respectable witnesses.
The 20th section of the general land law enacts “ that the commissioner of the general land office is hereby authorized to grant to all persons holding an order of survey, legally obtained previous to the closing the land offices in 1835, and having a survey which was made agreeably to such order and in conformity to law in all respects; a patent for the same upon the holder presenting the certificate of some board of land commissioners, that he is entitled to the quantity of land surveyed, and making such proof to them as is required by law, and upon his paying such fees as the laws require.”
' Such being the political acts regulating-the course of proceedings by which imperfect titles shall be recognized and prepared for a perfect title, it would seem that before the title or claim of Menard could be evidence under the 23d section of the statute of limitations, he would have to show that he had strictly brought himself within the law, by presentation to some board of land commissioners, and procuring their certificate that he had made such proof as the law required. Such certificate would be a specific recognition of his right; without it there was no recognition within the meaning of the statute, and his evidence could give him no standing in a court of law or equity.
The government in the case at bar cannot be justly charged of a failure to discharge its obligation to the citizen, because it has pointed out the mode by which his claim can be consummated and matured into a perfect grant; if he has failed to conform to the provision so made, it -is either his fault or his misfortune; until he does comply witli the terms of the law his claim cannot be considered, either on principles of equity or law. The construction we have given to the laws regulating imperfect titles is not new. The decisions of the su-pi’eme court of the republic in the case of the Board of Land Commissioners v. Riley, and in the case of Walling v. The Republic, declared the same interpretation, and the same to some .extent decided by this court in Trimble v. Smithers et al.
*(555) "We decline saying anything about how far such claim coupled with an actual possession could be used as a shield until a better title appeared against it; perhaps to some extent and under particular circumstances it could be made available. We only say that as title, such claim cannot be set up in our courts.
The court ought clearly to have given the last charge asked by the defendant’s counsel, with perhaps this qualification: the charge prayed did not exactly follow the law, in this, that the survey must have been made subsequent to the issuance of the order of survey. We are not prepared to say, nor is it necessary to decide, but that if1 the land had been surveyed by a legally authorized surveyor (that is, the work had been done, ready to the hand of those that as colonists might wish to locate it), such survey would be sufficient, the return being made after the issuance of the order. This is believed to have been in very general practice by the surveyors under the empresarios. If it had been surveyed before the order of survey, the same surveyor could certainly with propriety swear to the correctness of his field notes as well, and with as much truth, as if he had waited to receive the order before he made the survey. This, however, as before observed, is not material in this case, and we only intimate an opinion, as it was raised by the brief of the appellant.
For the foregoing reasons the judgment of the district court for the county of Liberty, in this ease, must be reversed and the cause dismissed.