J. EARL RUDDER ET AL v. RUSSELL S. PONDER ET AL

No. A-5192. Decided July 18, 1956.
Rehearing Overruled October 24, 1956.
(293 S.W. 2d Series 736)

186

*John Ben Shepperd,* Attorney General, and *Milton Richardson,* Assistant Attorney General, for petitioners.

The Court of Civil Appeals erred in holding that the common law of England was in effect as to the grant of land in this case and determined the location of the shore line of the survey in litigation, because this survey was made under the rules of the civil law two years before the adoption of the common law in Texas. Manry v. Robison, 122 Texas 213, 56 S.W. 2d 438; Motl v. Boyd, 116 Texas 82, 286 S.W. 458; Weatherly v. Jackson, 123 Texas 213, 71 S.W. 2d 259.

*Russell S. Ponder,* for himself, *Remy, Burns, Schiller & Lagerquist,* for Henry B. Dielmann, *Kelso, Locke & King* and *J. R. Locke,* for Taft properties, all of San Antonio, *J. W. Timmons, Martin A. Row,* and *Edwin M. Cage,* for Sun Oil Co., of Dallas, *Wood & Pratt,* of Corpus Christi, and *Weldon Cabiness,* of Rockport, for Glenn and J. D. Derrough, respondents.

MR. JUSTICE GRIFFIN delivered the opinion of the Court.

This is a suit to establish a vacancy along the Gulf Coast. The land in suit lies on Copano Bay in Aransas County, Texas. The respondents claim the proper boundary of the privately owned land on shore is the common law boundary along the contour line of 0.4 feet above sea level. The State, acting through Land Commissioner, J. Earl Rudder, et al, claims the true boundary line should be in accordance with Spanish and Mexican law. This point is 1.1 feet above sea level. The difference between these two elevations accounts for the vacancy. No party denies that the land covered by the sea under one or the other of the above contentions belongs to the State, and those who claim title from the State. The contest is the proper and legal location of the seaward boundary of the private property.

The case was tried before a court without a jury, and judgment rendered establishing a vacancy as to land claimed by the respondent, Ponder, but denying other claims of vacancy. The judgment of the trial court was that the common law rule as to the location of the shore line was the correct location. Only the Land Commissioner and the Attorney General appealed the trial court's judgment. The Court of Civil Appeals, in an exhaustive and well-reasoned opinion, affirmed. 275 S.W. 2d 509. In their application for writ of error petitioners say: "The question before the court in this cause concerns the proper location of the coastal boundaries of the William Steele Survey No. 2 in Aransas County, Texas. One related question is whether the common law or the civil law should be applied in determining these boundaries."

The pertinent facts are well stated by the Court of Civil Appeals as follows:

"After Texas became a Republic, but before it generally adopted the common law, Henry Smith, a transferee of the William Steele Land Warrant No. 840, dated December 8, 1837, caused John Talley, the Deputy Surveyor for Refugio County, to survey what is described in the field notes as '1280 acres of land' which fronted on the bay. Henry Smith, also a transferee of the Van Benthuysen Land Warrant No. 1188, dated December 20, 1837, caused the same surveyor to survey '640 acres of land' adjoining the other tract. The surveys were made and the field notes prepared with plat attached, and the surveyor, in accord with the law then in effect, made his affidavits that the plat, field notes and the survey were made since the first day of August, 1838. These affidavits were dated and signed by the deputy surveyor on September 23, 1839, and on the same date were certified as correct by the Refugio County Surveyor. The trial court found as a fact, based upon presumption, that the field notes on the two surveys were not filed in the General Land Office until after January 20, 1840, when the Republic generally adopted the common law. The patents were issued by Mirabeau B. Lamar during April of 1841."

From the above statement of facts it will be seen that the land certificates upon which the patents were later issued were dated in December, 1837. This was while Texas was a republic and prior to the Act of January 20, 1840, when the Republic adopted the common law as the rule of decision. However, it will be noticed that the patents were not issued until April, 1841, this being after the adoption of the common law. The State

claims that as soon as the certificate was located and the field notes prepared and certified as correct by the surveyor of Refugio County, the grantee in the certificates became the holder of a vested right of which he could not be deprived later by the adoption of the common law; therefore, the civil law applies. The respondents contend that up to the time of the issuance of the patent, the grantee had only an incomplete, inchoate and equitable right in so far as the Republic was concerned; that the patent having issued after the adoption of the common law that law should govern.

We hold with the contention of respondents and thus affirm the judgment of the Court of Civil Appeals. The Constitution of the Republic of Texas was adopted in March of 1836 and ratified in September of that same year. Article IV, Section 13, provided in part as follows: "The congress shall, as early as practicable, introduce, by statute, the common law of England, with such modifications as our circumstances, in their judgment, may require; and in all criminal cases the common law shall be the rule of decision." 1 Gammel 1074. With regard to land titles it provided in Article VI, Section 9, that "all grants and commissions shall be in the name, and by the authority of the Republic of Texas, shall be sealed with the great seal, and signed by the president." 1 Gammel 1076. In addition the Constitution provided, "so soon as convenience will permit, there shall be a penal code formed on principles of reformation, and not of vindicative justice; and the civil and criminal laws shall be revised, digested, and arranged under different heads; *and all laws relating to land titles shall be translated, revised and promulgated.*" (Emphasis added). Constitution of the Republic, General Provisions, Sec. 7, 1 Gammel 1079. Among other things, Section 10 provided "* * * no survey or title which may hereafter be made shall be valid, unless such survey or title shall be authorized by this convention or some future congress of the republic." 1 Gammel 1079-1081. This Section 10 also provided for the establishment of a general land office "where all land titles of the republic shall be registered," and for the *sectionizing* of the whole territory of the Republic. Under the Spanish and Mexican law "sections" were unknown as a measure of land, but land was measured in leagues or sitios, labors and haciendos. A "section" was a common law term. To carry into effect the above constitutional provision to establish a general land office, the Congress of the Republic, on December 22, 1836, established a General Land Office and prescribed the number of "acres" of land to be granted to persons settling in Texas after January 1, 1837. On June 12, 1837, the Land Office Act was sup-

plemented, and on the same day another act was passed instructing the president of the Republic to cause the "vacant lands of the republic to be surveyed and sectionized in tracts of 640 and 320 acres each." The Land Office had been closed in the latter part of 1835 due to the unsettled conditions in Texas because of the struggle for independence from Mexico. The Land Office was not opened again until February 1, 1838, and then by virtue of Section 39 of the Land Office Act of December 14, 1837.

On December 14, 1837, before the Land Office of the Republic had actually opened, Congress passed an act establishing the land office and "* * * to reduce into one act, and to amend the several acts relating to the establishment of a General Land Office." 1 Gammel 1404-18. This 1837 Act provided for a county surveyor to locate land certificates upon the vacant public lands in each county; a board of land commissioners to have general charge and supervision of the issuance and location of lands under valid certificates, and to transmit the necessary documents when the preliminary steps had been taken to the Commissioner of the General Land Office. The land commissioner, upon receipt of such papers in proper form, "shall forthwith make out in due form a patent for said land, and record the same in a book to be kept for that purpose," and send the original patent to the president of the Board of Land Commissioners who, after duly making a record of the same, should deliver the original patent to the party entitled to receive the patent. Section 36. Section 7 of this Act provided that all patents should be issued in the name of the Republic of Texas and under the seal of the Land Office, signed by the president of the Republic and countersigned by the Commissioner, or chief clerk. This act also provided that the county surveyor should receive certain fees for his work in making the survey, "three dollars for each English linear mile actually run." Section 37. This was the first time the English or common law mile had been provided as a measure of payment. All previous laws had provided payment for the Castillian, or metric linear mile—the Spanish and Mexican measurement. At all times since this act of 1837, all land matters have been set out in our statutes in terms of the common law, rather than the Spanish or Mexican law. Thus the Congress of the Republic of Texas in 1837, 1840 and 1841, in regard to land titles, carried out the command of Article IV, Section 13 of the Constitution of 1836 to introduce the common law of England by statute as early as practicable.

The case of Warren v. Shuman, 5 Texas 441, gives a concise

history of the land legislation of the early days of the Republic. It is there stated:

"The Act adopted Jan. 29, 1840, (Acts of 1840, p. 139,) authorized the appointment of Commissioners to ascertain and report what certificates had been issued to legal claimants; and the Commissioner of the General Land Office was prohibited from issuing a patent *upon any survey* 'which shall not have been, or may thereafter be made by virtue of a certificate returned as genuine and legal, by the Commissioners appointed under this Act:' and a patent issued contrary to the provisions of the Act, is declared to be null and void. By an Act approved February 5, 1840, (Acts of 1840, p. 161,) locations and surveys, from and after the first day of May thereafter, were prohibited on certificates not certified as having been reported to be genuine and legal: and *all surveys made contrary to the intent and meaning of the Act, were declared to be null and void.* The Commissioner of the General Land Office was, by an Act of the 19th of January, 1841, required to issue patents upon all claims which had been, or might thereafter be recommended by the investigating Board of Commissioners. By the Act of Congress of the 4th of February, 1841, (Dallam, 334,) individuals holding unrecommended certificates, were authorized to file their petitions in the District Court, setting forth the grounds of their claims; and, on a verdict of the jury in their favor, they were entitled to a certificate to that effect: and the Commissioner of the General Land Office was required to issue a patent on said claims, in the same manner as if said claims had been recommended as genuine and legal by the Board of Commissioners, appointed under the Act to detect fraudulent land certificates. * * * *." (Emphasis added.) Warren v. Shuman, supra, p. 450.

■ Until such time as a patent had been issued by the Republic the owner of a valid and legal certificate for a certain amount of land, or an owner who had located this certificate on the unappropriated public domain, as against the Republic, had only an imperfect or *inchoate* right to receive such land. This was an *equitable* right and one which so far as third parties were concerned was a superior right to all other claimants locating after date of such owner's original location.

In discussing the time at which the State gave up its title to public land, Mr. Justice Lipscomb, speaking for the Court in the case of Hart v. Gibbons, 14 Texas 213, at p. 215, says:

"* * * The question cannot be regarded as open in the

Court at this time, as, since the case of Hosner v. DeYoung, (1 Texas R. 764) it has been the uniform doctrine of the Court, that the State did not surrender the dominion and control of the public domain, until final and complete title had been issued. * * * No incipient or incomplete title, acquired during that interval, could present any legal bar to a restoration of the rights of the first locator. If the patent had issued to the appellant (the junior locator) before the passage of the relief law, the patent would have given him a valid title, not to be affected or impaired by the Act of the Legislature. * * * *The pretention that an incipient title to a part of the public domain creates such a vested right as to place it beyond the control of legislation, cannot be sustained as a conclusion, either from the legislation or from any judicial decision.* (Emphasis added.)

"It has been contended that the authority given by Statute (Hart Dig. Art. 3230) to sue for land on which the plaintiff had located a valid certificate, is a recognition of the fact that the fee, by such location, had passed from the State. This is not a fair inference. It amounts to nothing more than this, that the person holding the incipient title shall recover and hold against all who cannot show a better title, but does not conclude the State. It is competent for the State to say what degree of title, less than the fee, shall be sufficient to sustain an action for the protection of the rights of the party, whatever they may be, against those who have not an equal or superior right. This the State may well authorize, without a relinquishment of the fee in the land sued for."

The case of Hosner v. De Young, 1 Texas 764, in discussing the right of a certificate holder to force the county surveyor to survey land out of the unappropriated public domain, Justice Lipscomb said:

"That the fee, being in the Government until it passes into a perfect grant, no suit can be sustained, to compel the government to divest itself of the title, until the political authority has prescribed the mode in which it shall be done; that in all such cases, the political authority can establish, alter and modify such regulations from time to time, as may be deemed necessary in maturing an imperfect into a perfect title; that this control is necessary to the protection of the public domain, and a consequence resulting from the fee being in the Government."

To the same effect is the case of League v. De Young, et al, 2 Texas 497, 500. The League case was affirmed by the United States Supreme Court in 52 U.S. 185, 13 L.Ed. 657.

The case of Keith v. Guedry, 103 Texas 160, 122 S.W. 17, and 125 S.W. 5, was a contest between two certificate owners as to which had the better title to the common land covered by both certificates. Guedry held his title under John P. Wilds, whose original certificate and survey and field notes on the land in conflict was prior in time to the certificate and field notes and patent isued to John M. Bowyer, under whom Keith claimed title. The Wilds certificate was isued on January 15, 1845, in lieu of a certificate dated July 4, 1839 by the Board of Land Commissioners of Jefferson County, Texas. The 640 acres covered by the certificate was surveyed April 30, 1856 by the county surveyor of Jefferson County, and the field notes recorded in the surveyors' office on April 30, 1856, and filed, together with an attached map showing the location of the land, in the General Land Office on July 14, 1856, but no patent ever issued thereon. On March 27, 1886 these field notes were endorsed in pencil as being in conflict with the John M. Bowyer survey. The Bowyer claim was by virtue of a certificate issued on January 24, 1879, in lieu of a certificate to Bowyer dated August 9, 1851. The Bowyer lands were surveyed March 30, 1881. The field notes of this survey were filed in the General Land Office on April 12, 1881. On October 25, 1881, these field notes were endorsed as in conflict with the Wilds survey, and on November 9, 1883 endorsed as having been corrected. Patent was issued on these field notes on July 2, 1886, and duly recorded in Hardin County (originally Jefferson County) in 1897 where the land was then situated.

By statute of August 30, 1856, it was prescribed that all surveys and field notes, in the same condition as Wilds was, should be returned and filed in the General Land Office prior to August 1, 1857, and upon failure to do so, the survey should be forfeited. Wilds' survey and certificate were not returned and filed within the time prescribed. Upon trial, judgment was rendered by the trial court for Guedry, the claimant under the Wilds title. This was affirmed by the Court of Civil Appeals. The Court of Civil Appeals held (1) that the issuance of the certificate to Wilds constituted a contract between him and the State under which he was entitled to appropriate 640 acres of the public domain, and (2) that the location and survey of the land and return of the field notes to the General Land Office under that certificate constituted a vested right in the owner of it to that survey of land. All these things having been done prior to the act of August 30, 1856, it was claimed said act could not divest Wilds of his ownership of the 640 acres. The Supreme

Court reversed and remanded the cause to the trial court upon the holding:

"It is true that a survey under the Wilds certificate and the return of the field notes and certificate would have constituted a vested right in that land to the extent that it secured to the owner of the certificate a right to perfect his imperfect title to the land in the manner and time prescribed by law, or that should thereafter be prescribed; but it did not invest the owner with the title to the land that remained in the state until the patent should be issued. In order to complete his title Wilds, or his assignee, was required to present the certificate to the Commissioner of the General Land Office and procure a patent for the land. The location and survey could not have been perfected into full title without presenting the certificate to the Commissioner of the General Land Office and depositing it with him. * * * ."

See also Note 6 to 1 Texas Rep. (reprints) 766, and authorities therein cited; Jones v. Menard, 1 Texas 771; City of San Antonio v. Strumberg, 70 Texas 366, 7 S.W. 754; 9 Texas Jur. 304.

■ When the Republic of Texas adopted the common law of England on January 20, 1840, it adopted the common law as to the boundary of the sea touching the William Steele Survey No. 2. This boundary was the mean high tide of the sea waters. The title of those claiming under the William Steele and Van Benthuysen certificates being only an incomplete and inchoate title on January 20, 1840, when the common law was adopted, their rights became complete and superior to the State in April, 1841 when the patents were isued by the Republic. On this last date the common law was the rule of decision and governed the fixing of the shore line. The application of the common law to the boundary as of date of issuance of the patent does not take any property away from those holding the land certificates. It gives these holders more land than they would have received if the civil law shore line applied. As said in the case of Barney v. City of Keokuk, 94 U.S. 324, 24 L.Ed. 224, if the republic chose to resign to the riparian proprietor rights which had theretofore belonged to the republic in its sovereign capacity, it is not for others to raise objections.

The facts in this case showing neither of the certificates involved herein were issued and located in 1836 when the Congress of the Republic established the land office and enacted a

comprehensive law governing land titles and patents, nor that any locations were made on December 14, 1837 when Congress placed all the acts regulating the Land Office and land titles in one act, all rights of the State were governed by the common law after these dates. No patent had been issued when the Acts of 1840 and 1841, referred to above, were adopted. These Acts required previous certificates and surveys to be confirmed by the Board of Land Commissioners before patents could be issued on such certificates and surveys. These provisions were not in the civil law in force while Texas was under the rule of Mexico, but constitute a new and independent authority of the Republic of Texas over her public lands.

Petitioners contend that Section 2 of Act of January 20, 1840, adopting the common law, specifically recognized that the civil law affecting public lands remained in effect. We do not agree. Section 2 provides for the repeal of all laws in force in the Republic prior to September 1, 1836, "except * * * *such laws as relate* exclusively to grants and the colonization of land in the State of Coahuila and Texas, * * *." This exception does not apply to our case for this land was not a grant and colonization of lands in the State of Coahuila and Texas. The certificates were not isued until December, 1837, when Texas was a republic; the survey was not made until a date between August 1, 1838 and September 23, 1839.

The cases cited by petitioner to support his theory of the survey of the land being a vested right not subject to be changed by the State are all cases between private individuals to determine which had prior rights, and do not involve the rights of the Republic of Texas.

■ The trial court found that the field notes of neither of these surveys locating either certificate were filed in the General Land Office until after January 20, 1840. The fact that the Land Office Act of 1837, Section 36, provided that as soon as a certified copy of the field notes and plat had been filed with the Board of Land Commissioners and the legal fees paid, the president of the Board shall "* * * transmit the field notes to the commissioner of the general land office, *who shall forthwith* make out in due form a patent for said land * * *," record the same in a book in his office, and transmit the original to the president of the Land Board of the county where the land lies, who was required to enter a minute of the issuance of the patent on his record, and deliver the same to the party entitled to receive same; plus the further fact that no patent had been is-

sued up to the Act of January 29, 1840, providing for screening of surveys and certificates by the Board, established by such Act; plus the further fact that patent was issued April, 1841, a short time after the Act of January 19, 1841, requiring patents to be issued on all certificates and surveys which had been or might thereafter be recommended by the Board set up by the Act of January 29, 1840, is some evidence that the field notes of the located surveys were not filed in the General Land Office until after January 20, 1840, and thus support the trial court's finding to this effect. This finding has been affirmed by the Court of Civil Appeals. Under all the facts and circumstances of this case, we cannot say there is no evidence in the record to support such finding, and therefore we cannot overturn the trial court's decision.

■ The State contends that the true boundary, regardless of which rule of law is applied, was "the toe of the bluff" seaward from and on this land. The trial court held that the line along the shore of Copano Bay was a meander line. Stover v. Gilbert, 112 Texas 429, 247 S.W. 841, 843; 11 C.J.S. 573, Sec. 30b. The Court of Civil Appeals has held the evidence sufficient to support such finding. In this Court the State contends all of the evidence shows that the toe of the bluff is the civil law shore line. We hold that the civil law shore line is not the correct boundary. Also, the evidence is to the effect that the civil law shore line is on contour 1.1 feet above sea level, but does not show that the contour line is the same line as made by the toe of the bluff.

The line along the sea being a "meander line," the field notes thereof do not make the outer boundary, but the outer boundary is the shore line, and in our case is the shore line as determined by the common law, or on the 0.4 foot contour above sea level.

The judgments of both courts below are affirmed.

Opinion delivered July 18, 1956.

MR. ASSOCIATE JUSTICE MCCALL not participating.

MR. JUSTICE SMITH dissenting.

I respectfully dissent.

The main question to be determined in this case is whether the civil law shore line or the common law shore line should

prevail over the lands in question. This case originated as Mineral Application No. 42289 filed in the General Land Office, as provided for in Art. 5421(c), Vernon's Annotated Civil Statutes, by Russell S. Ponder concerning land either in or on Copano Bay in Aransas County and known as Egery Flats. The application was granted in part and denied in part. Pursuant to Sec. 6J of Art. 5421(c) Vernon's Anno. Civ. Stat., Ponder filed suit in the District Court in Aransas County naming interested parties defendant, as required by Sec. 6J. Answer and cross-action were filed, the cause was tried, without a jury, and a judgment was rendered favorable in part and unfavorable in part to petitioners. Petitioners are J. Earl Rudder and John Ben Shepperd as members of the School Land Board of Texas, and The State of Texas. Respondents are Russell S. Ponder, Sun Oil Company, Taft Properties, Inc., Henry B. Dielmann, and Glenn Derrough et al.

The petitioners contend that the state is the owner of all lands submerged by tidal waters. By their Second Amended Original Answer and Cross-Action the petitioners admitted that the tract of land designated in the record as Tract "A" was vacant land, but by way of cross-action against the plaintiffs as well as the other respondents, asserted ownership of approximately 572.1 acres of land lying below the "toe of the bluff" as located by surveyor Herbert Whelan.

The judgment of the trial court which was entered on December 15, 1953 dealt with the land involved as nine separate tracts and entered its judgment as follows:

1st. Tract No. 1, consisting of 139.98 acres of land out of an area known as Egery Flats in Aransas County, Texas, was awarded to The State of Texas for the Permanent Free School Fund of Texas, subject, however, to the preference right of plaintiff, Ponder, to purchase an oil, gas, and mineral lease, etc., and subject further to the right of any good faith claimants as defined in Art. 5421(c), etc.

2nd. Tracts 2, 5, and 9, comprising 120.43 acres, were awarded to the State as submerged land.

3rd. Tracts 3 (27.51 acres) and 4 (155.31 acres) to defendant, Taft Properties, Inc.

4th. Tract 6 (143.15 acres) was awarded to defendants Fred M. Percival and Sun Oil Company as their respective interests may appear.

5th. Tract 7, consisting of 14.10 acres, and Tract 8, consisting of 103.28 acres, were awarded to defendant, Henry B. Dielmann.

The judgment further decreed that Tract No. 1 (139.98 acres) was vacant, unsurveyed land, not in conflict with land previously titled, awarded, or sold by the State, and subject to lease; and, that the plaintiff, Ponder, had a preference right to purchase an oil, gas, and mineral lease upon said State Tract Number 1, all in accordance with Art. 5421(c), supra., subject to the rights of any good faith claimants, as defined by said Art. 5421(c), and specifically subject to the rights of the defendants, Glenn Derrough and J. D. Derrough, declared to be good faith claimants by the terms of the judgment.

The District Court as a basis for its judgment concluded as a matter of law that the coastal boundaries of the lands in controversy should be determined in accordance with the rules of the common law. Such conclusion was reached largely on the theory that since the common law was adopted on January 20, 1840 and the patents were not issued until April 7, 1841 and April 10, 1841, the common law boundary of "ordinary high tide" was applicable, and not the civil law boundary which places the boundary between the state and owners of coastal lands at the line of "highest tide." The distinction between civil law grants and common law grants will be discussed later in this opinion. At the moment it is first important to determine which rule applies under the record in this case.

This case involves a public grant and materially affects the Permanent School Fund of this state, and unless under the rules of strict construction the state has relinquished its title to the lands involved, we cannot permit a theory of liberality or one that it makes very little difference which rule is applied to take from the state and the Permanent School Fund one foot of soil still owned by the sovereignty.

I attach no legal significance to the transition from the Spanish to the English language and the use of some English units of measurement such as the mile, the acre, the section, and the fact that the county surveyor was to be paid "three dollars for each English linear mile actually run." The vara is still in common use by surveyors. The history of the Texas vara is set out in Taylor, *The Spanish Archives of Texas*, p. 74, as follows:

"Finally, by agreement among themselves, colonial survey-

ors converted the awkward and elusive Mexican vara into the convenient 33 1/3 inch vara. As a decimal inch measure (three varas equal one hundred inches), it is an ideal unit and is easily calculated into English feet, yards, and acres. When the General Land Office was organized, John P. Borden, the first commissioner and previously one of Stephen F. Austin's surveyors, was doubtless responsible for recognizing 33 1/3 inches as the established length of the vara. All lands surveyed in Texas since it became a republic have been or supposedly have been surveyed with a 33 1/3 inch vara. By silent acceptance and without statutory recognition, it has been used to survey and grant hundreds of millions of acres of land. Texas is the only place that knows or uses it. It stands alone in the standard measures of the world and is a monument to the old Austin colony surveyors who originated it; and it is perpetuated in the field notes of every survey of land granted by the republic and state of Texas. 'After Texas independence all grants of land were in acres, and any length chain or unit of measure could be used without affecting the number of acres in the survey. But the field notes sent to the General Land Office had to give the length of lines in varas of 33 1/3 inches for no other measure has ever been accepted in surveying public lands.' "

The Court of Civil Appeals has held that "under the Constitution and Statutes of the Congress of the Republic, a 'grant' meant a final title or patent." Breaking this down a step further, it was held that the date of the patent determines the time of the grant and not the date of the survey. This theory has been approved by the majority. A theory has also been advanced that there is some significance to be attached to the fact that the field notes of the original surveys involved were not filed in the General Land Office until after January 20, 1840. Another highlight of both opinions and one that seems to have been influential in bringing the Court of Civil Appeals and the majority to the conclusion that the true boundary was governed by the common law is the fact that *"the trial court held that the line along the shore of Copano Bay was a meander line."* Emphasis added.

The Court of Civil Appeals made another controlling holding so far as it was concerned and that was as follows:

"Under the Constitution and Statutes of the Congress of the Republic, grants made by the Republic between September, 1836, and January 20, 1840, were made under the principles of the common law."

This latter holding would preclude the state from a recovery of its theory that the time of the "grant" is determined by the date of the survey, which in this case was in 1838 or 1839, a time when the civil law was in effect according to its contention. However, I do not construe the majority opinion to be in agreement with the Court of Civil Appeals on this particular holding. The majority of this Court, as I understand it, simply holds that the patent was not issued until after January 20, 1840, and that the rule of the common law became effective on that date, and is therefore applicable to this case.

With this I cannot agree. The William Steele survey was originally surveyed by John R. Talley at some date between August of 1838 and September of 1839, and these identical field notes were incorporated in the patent dated April 1841 as a description of the land.

It is my contention that a land certificate located by a valid survey on the ground gave a vested property right in the land enclosed by the field notes and necessarily the boundaries became fixed and certain as of the time of survey on the ground, and I further contend (1) that the common law method of fixing the shore line had not been adopted as the law of Texas either at the time of the survey (1838 or 1839) or at the time of the Patent in April 1841, and (2) if the common law method of fixing the shore line was adopted between the date of the survey and the time of the issuance of the patent thereon in 1841, then I say the civil law must control because the survey was made under the civil law.

The Constitutional Convention adopted Schedule No. 1, as follows:

"That no inconvenience may arise from the adoption of this Constitution, it is declared by this Convention that all laws now in force in Texas, and not inconsistent with this Constitution, shall remain in full force until declared void, repealed, altered or expunged by their own limitation. On January 20, 1840, the Congress did provide by Statute that the Common Law * * * (so far as it is not inconsistent with the Constitution or the Acts of Congress now in force) shall, together with such acts, be the rule of decision. * * *."

It added this significant paragraph:

"Be it further enacted, That all laws in force in this Repub-

lic, prior to the first of September, one thousand eight hundred and thirty-six (except the laws of the Consultation and Provisional Government, now in force, and except such laws as related exclusively to grants and the colonization of lands in the State of Coahuila and Texas, and also such laws as relate to the reservation of islands and lands, and also of salt-lakes, licks, salt-springs, mines, and minerals of every description; made by the General and State Governments), be, and the same are hereby repealed."

Another cogent reason for holding that this case is controlled by the civil law and not the common law, and that the date of the survey determines the date of the grant is the fact that the Congress of the Republic adopted the Act of February 5, 1841, effective March 1841, which was designated by the Congress as an Act of "Limitations" Section 23 found at page 634, Vol. 2, Laws of the Republic of Texas, and reads as follows:

"Be it further enacted, that all certificates for headrights, and scrip, bounty warrant, or any other evidence of right to land recognized by the laws of this government, which have been located or surveyed shall be deemed and held as sufficient title to authorize the maintenance of actions of ejectment, trespass, or any other legal remedy given by law: *All laws to the contrary notwithstanding*. See Paschal's Digest, Art. 5303. Emphasis added.

Our present statute, Art. 7375, Vernon's Annotated Civil Statutes, reads:

"All certificates for head-right, land script, bounty warrant, or any other evidence of right to land recognized by the laws of this state, which have been located and surveyed, shall be deemed and held as sufficient title to authorize the maintenance of the action of trespass to try title."

This Act in identical language will be found in Revised Civil Statutes of Texas 1925, as Art. 7375, 1911, as Art. 7742; 1895 as Art. 5259, and in 1879 as Art. 4795. For further reference see Michies Digest, pages 286 and 287.

In Sayles, *Real Property*, Vol. 1, p. 473, the author says:

"The location of a certificate upon any vacant public domain subject thereto severs the land covered by it from the mass of the public domain until the expiration of the period within

which a survey was required to be made. Such location conferred a vested right which could not be defeated by the refusal of the officer to accept the location, by the subsequent issuance of a patent for the land embraced in the location to another, or by subsequent legislation."

In Hamilton v. Avery, 20 Texas 612, the Court said:

"Our courts have recognized a survey, by virtue of a valid certificate, as a valid right; a right of property, as fully as any other rights. It is a right binding on the government; upon which the government, through the commissioner of the general land office, can be compelled, by judicial process, to issue a patent * * *. It is recognized by the government as his property, and not public domain, by being taxed and sold for taxes, the same as titled lands * * *. It confers the right to maintain a suit upon it, to try the title and eject trespassers. It gives a right which is the subject of possession; of purchase; and of inheritance. It is sold under execution, and administered in courts of probate. It is regarded in the community as possessing but little less marketable value than patented land. * * *."

The early case of Sherwood v. Fleming, 25 Texas Supp. 408, exploded the theory that the case of Hart v. Gibbons, 14 Texas 213, et seq. (a case relied upon by the respondents) is applicable by holding the question was not involved in that case. The Courts aid in part:

"A locative certificate gives a right to land. It is property, and as such is within the protection of the constitutional guarantees.

"We are referred, for the appellant, to the case of Hart v. Gibbons, which is supposed to maintain the doctrine that the government retains the power of absolute disposition of land until the patent issues, although it has been located and surveyed by the holder of a valid certificate. There is no decision of this court which maintains such a doctrine, but an examination of the case will show that that question was not involved in the decision."

The old surveys are examined daily to determine vacancies, excesses, and existing boundaries, and along with modern developments in law, economics, and industry, the old grants assume new significance and importance. The Spanish Archives have been and remain the major source of conclusive evidence

in the location and establishment of the title to Texas lands. About the time, prior to and subsequent to the date of the survey of the lands involved in this suit, and the time of the subsequent issuance of the patent, conditions due to the outbreak of open hostilities between Texas and Mexico, and the ultimate establishment of the Republic of Texas, were very unsettled and in order to protect the general welfare of the country, all operations concerned with the granting of lands were suspended. After the winning of Texas' independence, the Constituiton of the new Republic designated November 13, 1835 as the official date of the closing of the various land offices and declared null and void all titles, surveys, and locations of land made thereafter. The new government immediately adopted the Mexican civil law and validated all land titles made in conformity with the colonization laws governing their issuance. The Republic of Texas then provided that from the public domain grants would be made to colonists who had failed to obtain their titles from Mexico, to new settlers, and to all soldiers who had rendered services in the Texas Army. The General Land Office was created, and its chief officer, the Land Commissioner, was given the authority "to superintend, execute, and perform all acts and things touching or respecting the public lands of the republic of Texas." John P. Borden, the first Commissioner, was appointed to gather the archives and to house the records. Without such office and without funds, Borden set out to collect the archives. With the exception of Austin, DeWitt, and Carlos S. Taylor, the authorities were reluctant to give up their archives. The archives at San Antonio could not be located. At Nacogdoches, the records were at the home of the custodian and his excuse for nondelivery was that he was to ill. The surveyor of McMullen and McGloin's Colony carried the San Patricio records to Mexico, and DeLeon's archives at Victoria were believed to be destroyed. One man considered the field notes of his surveys in DeLeon's Colony as his own personal property and refused to send them in. Borden reported to the legislature on April 10, 1838 the many obstacles confronting him and advised the legislature of the confused state of the land records and six months later on November 7, 1838 Borden reported the archives were still incomplete. In the meantime, the republic had issued certificates covering millions of acres of land. Again on March 28, 1839 Borden directed an appeal to President Mirabeau Lamar for assistance. On April 20, 1839 the government was compelled to discontinue the issuance of patents. Fraud and irregular practices were found on every hand, and on October 23, 1839 Borden said in his report that

an individual holding less than ten certificates was considered a small operator. See Taylor, *The Spanish Archives of the General Land Office of Texas,* at page 108.

I have related this history in order to point out the reasons for the delay in the issuance of the patent and the filing of the field notes. There was nothing irregular about the survey in our case. The survey was accepted and recognized by the republic, the field notes were filed, and the patent containing the identical field notes was issued in April 1841. The survey and not the patent carved the land out of the public domain and conclusively defines the area finally granted by the patent. Since the patent cannot change this area, even by lowering the water level fixed by the meander lines in the survey, the survey, for the purpose of this case, is the time of the grant.

The date of the filing of the field notes can in no way be thought of as the date of the inception of the title to which the patent relates. All the cases which have come to my knowledge and particularly those herein reviewed make it crystal clear at least to me that the date the survey is actually made on the ground is the date of the inception of title and upon which all rights in the land rests. Any conjecture or finding as to when the field notes were filed and when the patent was issued in this case is immaterial. The patent was no more than a final recognition by the state of the rights which had already been acquired by the survey. It related back in time to the date of the survey, and this date is the one which must be looked to in determining what rights were acquired. In 1838 and 1839, the civil law was the rule of decision, and when the surveyor, Talley, meandered the lagoon adjacent to Copano Bay, his meanders went only to the civil law shore line of highest tide. Accordingly, the respondents never acquired any rights, and, therefore, acquired no rights in lands seaward of this civil law line. This civil law shore line will be discussed more fully later in this opinion.

In the case of Morrill v. Bartlett, 58 Texas 644, the Supreme Court describes a patent as merely an evidence of title "describing the land precisely as surveyed." No larger area is described in the patent than that described in the civil law field notes. In fact, a well established rule has been developed that the patent, when issued, relates back in time to the date of the survey and that the survey represents the inception of the title consummated by the patent.

In the case of Hollingsworth v. Holshousen, 17 Texas 41, the Court said: "* * * A location which is sufficiently specific and certain to identify the land which it is intended to appropriate, if followed by a timely survey, is an appropriation of the land, as well before as after the survey * * *." "Where the equities of the parties are in other respects equal, unquestionably the one having the prior location has the better right. * * * But where nothing appears in respect to any location anterior in date to the survey, that (the survey) must be taken to be the inception of the title. * * * The patent, when obtained, will relate to the inception of the title; * * *."

Again quoting from Morrill v. Bartlett, supra, the Court said:

"There can be no doubt but that Price or his vendees could have recovered against Ward or his vendees upon the certificate and the land surveyed by virtue of it, before the issuance of the patent. There can be no doubt, also, but that they were entitled to a patent describing the land exactly in accordance with such survey, and could have compelled the commissioner to issue it to Price. How, then, can they be debarred from such recovery by a mere failure on the part of the commissioner to perform the ministerial duty of issuing the patent in accordance with the survey."

"*As between Price and the government* he would certainly be entitled to the land surveyed, and to have the whole of it patented to him. * * *." Emphasis added.

For other cases see: Cagle v. Sabine Valley Timber and Lumber Co., 109 Texas 178, 202 S.W. 942, 6 A.L.R. 1426; Elliott v. Nelson, 113 Texas 62, 251 S.W. 501; Howard v. Perry, 7 Texas 259; Milam County v. Bateman, 54 Texas 153; 14 Michies Digest, pp. 286, 287; Adams v. Houston & T. C. Ry. Co., 70 Texas 252, 7 S.W. 729; New York & Texas Land Co. v. Thompson, 83 Texas 169, 17 S.W. 920; Chaison v. Stark, 29 S.W. 2d 500, reversed and rendered on another point in Texas Com. App., 50 S.W. 2d 776.

F. W. Hall writes in *An Account of the Adoption of the Common Law* by Texas, 28 Texas Law Rev. 801, 809 (1950), as follows:

"A few salient observations concerning the Act of 1840 adopting the common law are appropriate before an examination

is made of the cases construing the statute. First, the Act was prospective and applied only to cases arising after its effective date. Thus, especially for the next several years, the Texas courts had to apply the civil law doctrines (so far as they were able to do so) in cases which arose *or in which rights accrued prior to January 20, 1840."* Emphasis added.

Under the doctrine of relation back, as announced in the decided cases, it is clear that in 1836 or 1839, when John R. Talley surveyed the William Steele survey on the ground, all rights which could be obtained in the land vested. That the state could not decrease these vested rights cannot be successfully disputed. On the other hand, the vested rights could not be increased by the issuance of the patent. See Weatherly v. Jackson, 123 Texas 213, 71 S.W. 2d 259. The survey alone determines the extent of the rights acquired.

Adverting for the moment to the finding of the trial court that the line along the shore of Copano Bay was a meander line and admitting that the line is a meander line, suppose we analyze the situation with that premise in mind, then what is the net result? The authorities seem to hold that the general rule is: "That meander lines are run not as boundaries of the tract surveyed, but for the purpose of defining the sinuosities of the banks of the stream or other body of water, and as a means of ascertaining the quantity of land embraced in the survey, the stream, or other body of water, and not the meander line as actually run on the ground, being the boundary, whether the meander line in fact coincides with *the shore* or not." Emphasis added. C.J.S. Vol. 11, Sec. 30, pp. 573, 574. This general rule is subject to certain qualifications. See C.J.S. Vol. 11, Sec. 30, p. 574. So, if we say the line in this case is a meander line, then we are right back where we started. Where is the shore line? The respondent's control stops with the shore.

"Roll on, thou deep and dark blue Ocean—roll!
Ten thousand fleets sweep over thee in vain;
Man marks the earth with ruin—his control
Stops with the shore; * * *"—Lord Byron, *Childe Harold's Pilgrimage,* CLXXIX, p. 347.

This brings us to the next question to be determined. The Court of Civil Appeals has held in this case that "the grantee of meandered land owns at least to the shore line, whichever shore may be the correct one." In this case, the William Steele meander lines were originally placed at the civil law level of the

waters—the line of highest tide. The Court of Civil Appeals and the majority have held that the civil law shore line is not the correct boundary, but that the shore line, as determined by the common law, is on the 0.4 foot contour above sea level.

Under the record in this case, it is my opinion, that in the event it should be determined that the civil law shore line is the correct boundary this case should be remanded to the Court of Civil Appeals to reconsider the question in the light of such holding and the decisions hereinafter discussed.

The respondents have assumed the position throughout that it was not error to establish the property owners' property line at the contour line of 0.4 feet above zero of the U. S. Coast Geodetic Survey Bench Mark X 604, because the property owners' line on a seashore, bay or lagoon goes to the mean high tide line, which was established at such 0.4 contour line. The petitioners contended that "The toe of the bluff" line as shown by the evidence was the correct shore line. The respondents replied that "The toe of the bluff" line was not the criterion set up by law for established property lines at seashores, bays or lagoons, and that "The toe of the bluff" line was not the way to determine the line of mean high tide. Respondents further made the contention that "mean high tide is something that can be, and is, determined, by measuring the ebb and flow of the tide over a number of years, and not by some undetermined or often undeterminable land mark."

The Court of Civil Appeals rejected the contention of petitioners and adopted the view of the respondents solely because it was of the opinion that the question must be decided in accordance with common law rules. In any event, I do not believe this court can under the record render judgment for the petitioners in view of the holding that the state failed to prove the civil law shore line, and that because of its holding that the common law shore line was established, it was not error for the trial court to exclude certain evidence offered by petitioners on this question.

In the event this court adopts my views of this case, then the Court of Civil Appeals upon further consideration should be governed by such cases as State v. Balli, 144 Texas 195, 190 S.W. 2d 71; Humble Oil & Refining Co. et al., v. Sun Oil Company et al., 190 Fed. 2d 191; City of Galveston v. Menard, 23 Texas 349; Galveston City Surf Bathing Co. v. Heidenheimer, 63

Texas 559; *Gould on Waters* (3rd Ed.), p. 62, 64; 65 C.J.S. 194, *Navigable Waters,* Sec. 88; 44 Texas Jur. 127, *Waters, Sec.* 99.

The point I wish to make is that if the civil law rule applies the evidence offered by the respondents through the surveyor, Mr. Roberts, establishing the 0.4 contour line in this case cannot be used in any manner as a basis for a judgment. On the other hand, if the state, in the opinion of the Court of Civil Appeals, has failed to establish the civil law shore line, then necessarily the cause should be remanded to the trial court for a determination of the location of the shore line in accordance with the rules of civil law and not inconsistent with the opinion of this court if it adopts the views expressed in this opinion. The state introduced in the trial court evidence in an effort to establish the shore line and it contends that "the toe of the bluff" is the civil law shore line. The question of the sufficiency of this evidence is for the Court of Civil Appeals to determine.

Another theory has been advanced through Amicus Curiae briefs filed in this court. That theory is to the effect that under the holdings of the courts in the past it makes very little difference which rule followed. Whether the civil law or the common law, the result so far as area is concerned is about the same. This conception of the law cannot and should not be sustained. The state simply has not relinquished its title if its rights as against the rights of respondents are determined by the civil law. The respondents also advance the theory that the case of State v. Balli, supra, supports the contention presented by Amicus Curiae that the Balli case was determined by the law as incorporated in Las Siete Partidas which was in effect in the State of Tamaulipas at the time of the grant. Amicus Curiae proceeds to contend that the "Partidas" was something different than the civil law as contended for by petitioners and that in reality the common and civil law fix the same line.

In the Balli case, 144 Texas 195, 190 S.W. 2d 99, the court said: "It is clear from the decisions of this court that the rights of the state and respondents must be determined in the light of the civil law in effect at the time of the grant as it existed in the State of Tamaulipas. * * * It cannot be doubted that the law as incorporated in Las Siete Partidas was in effect in the State of Tamaulipas at the date of the grant." This court then went on to hold that the original source of the civil law of the seashore was the Institutes of Justinian and the ancient Roman law. For an interesting resume of the early Roman law see "Cooper's Justinian, Revision of 1852. Cooper's translation of

the Institutes of Justinian (written in Latin) reads: "All that tract of land over which the greatest winter flood extends itself, is the seashore." In the Balli case this court said the seashore extends as far as the greatest winter flood runs up. The law of Spain (Las Siete Partidas), which was effective in Tamaulipas when the grant was made, defined the seashore to be " 'all that ground is designated the shore of the sea which is covered with water of the latter at high tide, during the whole year, whether in winter or in summer.' " The court held that the law of the Partidas fixes the boundary between sea and upland, and that "thus the seashore was no part of the land, but always an adjunct of the sea * * * and the shores of the sea as common property is as old as the oldest Roman Law, but by its very nature and meaning there could never be an accession to the seashore as the seashore was defined in the law of Spain, which was effective in Tamaulipas when the grant in this case was made. The seashore was defined to be 'all that ground is designated the shore of the sea which is covered with water of the latter during the whole year, whether in winter or in summer.' "

■ It is well settled that the civil law boundary between sea and upland is highest water or highest tide either for the whole of the year or for the winter, and that highest tide is used in the decision in the sense of "as far as the greatest wave extends itself in winter" or "where the highest wave (of the year) boils up or foams." The Balli case and others as well as translations of the Roman law obviously do not refer in the least to astronomical tides, or whether the floods have come as a result of the pull of the moon or of action of the winds, or of a combination of both.

It is my opinion that the Balli case merely holds that under the evidence in the case there was no substantial difference in fact between the line of "high winter tide" and the line of "mean high tide." In other words, if there had been any evidence in that case of a substantial difference in the location of the line of "high winter tide" and "mean high tide," unquestionably the line of "high winter tide" would have controlled.

It is understandable that the state failed to concentrate on making proof as to the true shore line in the Balli case when it is realized that the chief contest in that case was centered around the question of ownership of the whole of Padre Island containing over thirty leagues of land. The evidence on the question of the shore line was very meager from both sides.

There was no evidence about winter's highest waves, no evidence of the year's highest swells whether summer or winter, no evidence of the highest tide during any part of the year. The Court of Civil Appeals in the Balli case, 173 S.W. 2d 522, pointed out that under the evidence introduced the theoretical difference in elevation between mean high tide for the whole year and mean high tide of the winter months was .09 of a foot. The state devoted very little space in its brief filed in the Supreme Court on this question, and this court affirmed the Court of Civil Appeals on this point in very short order.

Permit me to emphasize that this court in the Balli case did not hold that the civil and common law were the same on the question of establishing the true shoreline. The cases are abundant which hold to the contrary. In addition to those heretofore mentioned and discussed, I specially mention Heard v. Town of Refugio, 129 Texas 349, 103 S.W. 2d 728, wherein this court, speaking through Justice Smedley, said: "By the rule of the civil law private ownership of land along the coast stops at the line of the highest tide in winter, whereas the rule at common law restricts grants to the line of ordinary high tide." The court also said: "Presumption and the policy of the Mexican Civil Law favor public ownership." In the case of Borax Consolidated v. City of Los Angeles, 1935, 296 U.S. 10, 22, 56 Sup. Ct. 23, 29, 80 L.Ed. 9, the United States Supreme Court through Chief Justice Hughes said: "By the civil law, the shore extends as far as the highest waves reach in winter. [Citing both Justinian's Institute and the Digest]. But by the common law, the shore 'is confined to the flux and reflux of the sea at ordinary tides.' " For other references see: Angell (2d ed. Rev. 1847) p. 68; Rosborough v. Picton, 12 Texas Civ. App. 113, 34 S.W. 791, quoted with approval by this court in Hynes v. Packard, 92 Texas 44, 45 S.W. 562; The opinion of Judge James V. Allred, Federal District Judge, in the case of Sun Oil Company v. Humble Oil & Refining Company, supra. In that case on rehearing, 191 Fed. 2nd 705 at page 716, (certiorari den. 342 U.S. 920, 72 Sup. Ct. 367, 96 L.Ed. 687, the court cited with approval the Menard case, supra, in holding that under the Spanish law, the seashore extends to the line of the highest tide in winter. The court went on to hold that the area in controversy was formerly the bed of the sea and that the sea had not abandoned the area. It remains for the Court of Civil Appeals to decide the issue. Petitioners contend that it has discharged its burden, but the question of evidence is not for this court to pass upon.

210

In the case of City of Galveston v. Menard, 23 Texas 349, this court said: "By the civil law, the shores of the sea, of bays and navigable streams generally, as well as the tidewaters, were jealously guarded from private appropriation and reversed for the common use * * *." This holding has come to have a meaning of greater significance and consequence due to modern-day developments as the result of geological surveys definitely establishing the fact that oil is beneath the point of civil law tide. The rule announced by Judge Oran Roberts in the Menard case, supra, should be strictly followed in order to protect the Permanent Free School Fund of Texas. There is no logical reason to adopt the more liberal common law rule and thereby permit private appropriation of valuable lands to the injury of the State of Texas. The majority cites the case of Barney v. City of Keokuk, 94 U.S. 324, 24 L.Ed. 224. A study of that case as well as the cases of McManus v. Carmichael, 3 Iowa 1, and Haight v. The City of Keokuk, 4 Iowa 199, has convinced me that the common law was never intended to apply to streams and bodies of water in this state. It is my contention that the state in our case has not chosen to relinquish to private parties title to the lands which belong to it under the civil law which was in effect at the time of the grant in 1838 or 1839, the date of the survey.

Art. IV, Sec. 13, of the Constitution of the Republic of Texas, provides as follows:

"The Congress shall, as early as practicable, introduce, by statute, the common law of England, with such modifications as our circumstances, in their judgment, may require; and in all criminal cases, the common law shall be the rule of decision."

This adopted the common law as the rule of decision in criminal cases and directed Congress to "* * * introduce, by statute, * * *" the common law modified to meet "our circumstances."

It could not be more clearly stated that the Constitution was then adopting the common law in criminal matters and was *not* adopting the common law in civil matters because Congress recognized that the common law needed to be modified to fit the needs of Texas.

I would reverse the judgment of the Court of Civil Appeals and remand the cause to that court for further consideration.

Opinion delivered July 18, 1956.

Rehearing overruled October 24, 1956.